# UNITED STATES v. VENTRESCA.

No. 28.  Argued January 18–19, 1965.—Decided March 1, 1965.

*Frank I. Goodman* argued the cause for the United States. On the brief were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Ronald L. Gainer.*

*Matthew R. McCann* argued the cause for respondent. With him on the brief was *Edward C. Maher.*

MR. JUSTICE GOLDBERG delivered the opinion of the Court.

Respondent, Ventresca, was convicted in the United States District Court for the District of Massachusetts of possessing and operating an illegal distillery. The conviction was reversed by the Court of Appeals (one judge dissenting) on the ground that the affidavit for a search warrant pursuant to which the still was found was insufficient to establish probable cause. 324 F. 2d 864.

The affidavit upon which the warrant was issued was made and submitted to a United States Commissioner on August 31, 1961, by Walter Mazaka, an Investigator for the Alcohol and Tobacco Tax Division of the Internal Revenue Service. He stated that he had reason to believe that an illegal distillery was in operation in respondent, Ventresca's, house at 148½ Coburn Avenue in Worcester, Massachusetts. The grounds for this belief were set forth in detail in the affidavit, prefaced with the following statement:

> "Based upon observations made by me, and based upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their

observations and investigation, this request for the issuance of a search warrant is made."

The affidavit then described seven different occasions between July 28 and August 30, 1961, when a Pontiac car was driven into the yard to the rear of Ventresca's house. On four occasions the car carried loads of sugar in 60-pound bags; it made two trips loaded with empty tin cans; and once it was merely observed as being heavily laden. Garry, the car's owner, and Incardone, a passenger, were seen on several occasions loading the car at Ventresca's house and later unloading apparently full five-gallon cans at Garry's house late in the evening. On August 28, after a delivery of empty tin cans to Ventresca's house, Garry and Incardone were observed carrying from the house cans which appeared to be filled and placing them in the trunk of Garry's car. The affidavit went on to state that at about 4 a. m. on August 18, and at about 4 a. m. on August 30, "Investigators" smelled the odor of fermenting mash as they walked along the sidewalk in front of Ventresca's house. On August 18 they heard, "[a]t or about the same time, . . . certain metallic noises." On August 30, the day before the warrant was applied for, they heard (as they smelled the mash) "sounds similar to that of a motor or a pump coming from the direction of" Ventresca's house. The affidavit concluded: "The foregoing information is based upon personal knowledge and information which has been obtained from Investigators of the Alcohol and Tobacco Tax Division, Internal Revenue Service, who have been assigned to this investigation."

The District Court upheld the validity of the warrant on a motion to suppress. The divided Court of Appeals held the warrant insufficient because it read the affidavit as not specifically stating in so many words that the information it contained was based upon the personal knowledge of Mazaka or other reliable investigators. The

Court of Appeals reasoned that all of the information recited in the affidavit might conceivably have been obtained by investigators other than Mazaka, and it could not be certain that the information of these other investigators was not in turn based upon hearsay received from unreliable informants rather than their own personal observations. For this reason the court found that probable cause had not been established. 324 F. 2d, at 868–870. We granted certiorari to consider the standards by which a reviewing court should approach the interpretation of affidavits supporting warrants which have been duly issued by examining magistrates. 377 U. S. 989. For the reasons stated below, we reverse the judgment of the Court of Appeals.

I.

The Fourth Amendment states:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." [1]

We begin our analysis of this constitutional rule mindful of the fact that in this case a search was made pursuant to a search warrant. In discussing the Fourth Amendment policy against unnecessary invasions of privacy, we stated in *Aguilar* v. *Texas,* 378 U. S. 108:

> "An evaluation of the constitutionality of a search warrant should begin with the rule that 'the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be pre-

---

[1] The Fourth Amendment's policy against unreasonable searches and seizures finds expression in Rule 41 of the Federal Rules of Criminal Procedure.

ferred over the hurried action of officers . . . who may happen to make arrests.' *United States* v. *Lefkowitz,* 285 U. S. 452, 464. The reasons for this rule go to the foundations of the Fourth Amendment." 378 U. S., at 110–111.

In *Jones* v. *United States,* 362 U. S. 257, 270, this Court, strongly supporting the preference to be accorded searches under a warrant, indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall. In *Johnson* v. *United States,* 333 U. S. 10, and *Chapman* v. *United States,* 365 U. S. 610, the Court, in condemning searches by officers who invaded premises without a warrant, plainly intimated that had the proper course of obtaining a warrant from a magistrate been followed and had the magistrate on the same evidence available to the police made a finding of probable cause, the search under the warrant would have been sustained. Mr. Justice Jackson stated for the Court in *Johnson:*

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. Any assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify the officers in making a search without a warrant would reduce the Amendment to a nullity and leave the people's homes secure only in the discretion of police officers." *Johnson* v. *United States, supra,* at 13–14.

The fact that exceptions to the requirement that searches and seizures be undertaken only after obtaining a warrant

are limited [2] underscores the preference accorded police action taken under a warrant as against searches and seizures without one.

While a warrant may issue only upon a finding of "probable cause," this Court has long held that "the term 'probable cause' . . . means less than evidence which would justify condemnation," *Locke* v. *United States,* 7 Cranch 339, 348, and that a finding of "probable cause" may rest upon evidence which is not legally competent in a criminal trial. *Draper* v. *United States,* 358 U. S. 307, 311.

---

[2] The exceptions are illustrated by cases in which "seizure is impossible except without warrant," *Carroll* v. *United States,* 267 U. S. 132, 156, such as a search of a moving object where "it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought," *Carroll* v. *United States, supra,* at 153, and those in which search is incident to a lawful arrest. This latter exception is itself a limited one. We stated in *Preston* v. *United States,* 376 U. S. 364:

"Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime. *Weeks* v. *United States,* 232 U. S. 383, 392 (1914); *Agnello* v. *United States,* 269 U. S. 20, 30 (1925). This right to search and seize without a search warrant extends to things under the accused's immediate control, *Carroll* v. *United States, supra,* 267 U. S., at 158, and, to an extent depending on the circumstances of the case, to the place where he is arrested, *Agnello* v. *United States, supra,* 269 U. S., at 30; *Marron* v. *United States,* 275 U. S. 192, 199 (1927); *United States* v. *Rabinowitz,* 339 U. S. 56, 61–62 (1950). The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest." 376 U. S., at 367.

As the Court stated in *Brinegar* v. *United States,* 338 U. S. 160, 173, "There is a large difference between the two things to be proved [guilt and probable cause], as well as between the tribunals which determine them, and therefore a like difference in the *quanta* and modes of proof required to establish them." Thus hearsay may be the basis for issuance of the warrant "so long as there [is] a substantial basis for crediting the hearsay." *Jones* v. *United States, supra,* at 272. And, in *Aguilar* we recognized that "an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant," so long as the magistrate is "informed of some of the underlying circumstances" supporting the affiant's conclusions and his belief that any informant involved "whose identity need not be disclosed . . . was 'credible' or his information 'reliable.' " *Aguilar* v. *Texas, supra,* at 114.

These decisions reflect the recognition that the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract. If the teachings of the Court's cases are to be followed and the constitutional policy served, affidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting.

This is not to say that probable cause can be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying circum-

stances" upon which that belief is based. See *Aguilar* v. *Texas, supra.* Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police. However, where these circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants. *Jones* v. *United States, supra,* at 270.

## II.

The application of the principles stated above leads us to reverse the Court of Appeals. The affidavit in this case, if read in a commonsense way rather than technically, shows ample facts to establish probable cause and allow the Commissioner to issue the search warrant. The affidavit at issue here, unlike the affidavit held insufficient in *Aguilar,* is detailed and specific. It sets forth not merely "some of the underlying circumstances" supporting the officer's belief, but a good many of them. This is apparent from the summary of the affidavit already recited and from its text which is reproduced in the Appendix.

The Court of Appeals did not question the specificity of the affidavit. It rested its holding that the affidavit was insufficient on the ground that "[t]he affidavit failed to clearly indicate which of the facts alleged therein were hearsay or which were within the affiant's own knowledge," and therefore "[t]he Commissioner could only conclude that the entire affidavit was based on hearsay."

324 F. 2d, at 868. While the Court of Appeals recognized that an affidavit based on hearsay will be sufficient, "so long as a substantial basis for crediting the hearsay is presented," *Jones* v. *United States, supra,* at 269, it felt that no such basis existed here because the hearsay consisted of reports by "Investigators," and the affidavit did not recite how the Investigators obtained their information. The Court of Appeals conceded that the affidavit stated that the Investigators themselves smelled the odor of fermenting mash, but argued that the rest of their information might itself have been based upon hearsay thus raising "the distinct possibility of hearsay-upon-hearsay." 324 F. 2d, at 869. For this reason, it held that the affidavit did not establish probable cause.

We disagree with the conclusion of the Court of Appeals. Its determination that the affidavit might have been based wholly upon hearsay cannot be supported in light of the fact that Mazaka, a Government Investigator, swore under oath that the relevant information was in part based "upon observations made by me" and "upon personal knowledge" as well as upon "information which has been obtained from Investigators of the Alcohol and Tobacco Tax Division, Internal Revenue Service, who have been assigned to this investigation." It also seems to us that the assumption of the Court of Appeals that all of the information in Mazaka's affidavit may in fact have come from unreliable anonymous informers, passed on to Government Investigators, who in turn related this information to Mazaka is without foundation. Mazaka swore that, insofar as the affidavit was not based upon his own observations, it was "based upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their *observations* and investigation." (Empha-

sis added.) The Court of Appeals itself recognized that the affidavit stated that " 'Investigators' [employees of the Service] smelled the odor of fermenting mash in the vicinity of the suspected dwelling." 324 F. 2d, at 869. A qualified officer's detection of the smell of mash has often been held a very strong factor in determining that probable cause exists so as to allow issuance of a warrant.[3] Moreover, upon reading the affidavit as a whole, it becomes clear that the detailed observations recounted in the affidavit cannot fairly be regarded as having been made in any significant part by persons other than full-time Investigators of the Alcohol and Tobacco Tax Division of the Internal Revenue Service. Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.[4] We conclude that the affidavit showed probable cause and that the Court of Appeals misapprehended its judicial function in reviewing this affidavit by giving it an unduly technical and restrictive reading.

This Court is alert to invalidate unconstitutional searches and seizures whether with or without a warrant. See *Aguilar* v. *Texas, supra; Stanford* v. *Texas,* 379 U. S. 476; *Preston* v. *United States,* 376 U. S. 364; *Beck* v. *Ohio,* 379 U. S. 89. By doing so, it vindicates individual liberties and strengthens the administration of justice by promoting respect for law and order. This Court is equally concerned to uphold the actions of law

---

[3] See, *e. g., Monnette* v. *United States,* 299 F. 2d 847, 850 (C. A. 5th Cir.). Cf. *Chapman* v. *United States,* 365 U. S. 610; *Steeber* v. *United States,* 198 F. 2d 615, 616, 618 (C. A. 10th Cir.); *United States* v. *Kaplan,* 89 F. 2d 869 (C. A. 2d Cir.).

[4] See, *e. g., Rugendorf* v. *United States,* 376 U. S. 528; *Chin Kay* v. *United States,* 311 F. 2d 317, 320 (C. A. 9th Cir.); *United States* v. *McCormick,* 309 F. 2d 367, 372 (C. A. 7th Cir.); *Weise* v. *United States,* 251 F. 2d 867, 868 (C. A. 9th Cir.).

112

enforcement officers consistently following the proper constitutional course. This is no less important to the administration of justice than the invalidation of convictions because of disregard of individual rights or official overreaching. In our view the officers in this case did what the Constitution requires. They obtained a warrant from a judicial officer "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the . . . things to be seized." It is vital that having done so their actions should be sustained under a system of justice responsive both to the needs of individual liberty and to the rights of the community.                                            *Reversed.*

APPENDIX TO OPINION OF THE COURT.

AFFIDAVIT FOR SEARCH WARRANT

BEFORE W. ARTHUR GARRITY, Worcester, Massachusetts The undersigned being duly sworn deposes and says:

That he has reason to believe that on the premises known as a one-family light green wooden frame dwelling house located at 148½ Coburn Avenue, Worcester, occupied by Giacomo Ventresca and his family, together with all approaches and appurtenances thereto, in the District of Massachusetts, there is now being concealed certain property, namely an unknown quantity of material and certain apparatus, articles and devices, including a still and distilling apparatus setup with all attachments thereto, together with an unknown quantity of mash, an unknown quantity of distilled spirits, and other material used in the manufacture of non-tax-paid liquors; which are being held and possessed, and which have been used and are intended for use, in the distillation, manufacture, possession, and distribution of non-tax-paid liquors, in violation of the provisions of 26 USC 5171 (a), 5173, 5178, 5179 (a), 5222 (a), 5602, and 5686.

And that the facts tending to establish the foregoing grounds for issuance of a Search Warrant are as follows:

SEE ATTACHED SHEET

> /s/ WALTER A. MAZAKA
> *Investigator, Alcohol and Tobacco Tax Div., Internal Revenue Service*

Sworn to before me, and subscribed in my presence, August 31st, 1961

> /s/ W. ARTHUR GARRITY
> *United States Commissioner*

Based upon observations made by me, and based upon information received officially from other Investigators attached to the Alcohol and Tobacco Tax Division assigned to this investigation, and reports orally made to me describing the results of their observations and investigation, this request for the issuance of a search warrant is made.

On or about July 28, 1961, about 6:45 P.M., an observation was made covering a Pontiac automobile owned by one Joseph Garry. Garry and one Joseph Incardone put thirteen bags of sugar into the car. These bags of sugar weighed sixty pounds each. Ten such bags were put into the trunk, and three were placed in the rear seat. Those in the rear seat were marked "Domino." The others appeared to have similar markings. After the sugar was loaded into the car, Garry together with Incardone drove it to the vicinity of 148 Coburn Avenue, Worcester, Massachusetts, where the car was parked. Sometime later, the car with its contents was driven into the yard to the rear of 148 and between the premises 148 and 148½ Coburn Avenue. After remaining there about twenty-five minutes, the same two men drove in the direction of Boston.

On August 2, 1961 a Pontiac car owned by Garry, and driven by Garry with Incardone as a passenger, was followed from Boston to Worcester. The car appeared heavily laden. The car was again driven into the driveway at 148 and 148½ Coburn Avenue to the rear of the yard and between the above-numbered houses.

On August 7, 1961 at least six sixty-pound bags of Domino Sugar were loaded into the Pontiac owned by Garry. The loading was done by Garry and Incardone. The car traveled from Boston to Worcester, then to Holden, and returned with its contents and entered the driveway at 148 and 148½ Coburn Avenue, where the car was parked at the rear between the two houses.

On August 11, 1961 new empty metal or tin cans were transferred from a car owned by Incardone to the Pontiac owned by Garry on Highland Street in Hyde Park. The Pontiac was driven by Garry with Incardone as a passenger to Worcester, and into the yard at 148 and 148½ Coburn Avenue to the rear and between the two numbered premises.

On August 16, 1961 the Pontiac was observed. In the back seat bags of sugar were observed covered with a cloth or tarpaulin. A sixty-pound bag of sugar was on the front seat. Garry was observed after loading the above-described sugar into the car placing a carton with various five-pound bags of sugar on the top of the tarpaulin. The car was then driven by Garry with Incardone as a passenger to Worcester together with its contents into the yard at 148 and 148½ Coburn Avenue to the rear of and between the two houses. About Midnight on the same night, the Pontiac driven by Garry with Incardone as a passenger was seen pulling up to the premises at 59 Highland Street, Hyde Park, where Garry lives. Garry opened the trunk of his car, and removed ten five-gallon cans therefrom, and placed them on the sidewalk. He then entered the house, and opened a door on the side.

Incardone made five trips from the sidewalk to the side of the house carrying two five-gallon cans on each such trip. It appeared that the cans were filled. On each of these trips, Incardone passed the two cans to someone standing in the doorway. Immediately after the fifth such trip, Garry came out of the door and joined Incardone. They walked to the sidewalk, and talked for a few moments. Incardone then drove away, and Garry went into his home.

On August 18, 1961 Investigators smelled an odor of fermenting mash on two occasions between 4:00 A.M. and 5:00 A.M. The first such odor was detected as they walked along the sidewalk in front of 148 Coburn Avenue, and the second such odor was detected from the side of 148 Coburn Avenue. At or about the same time, the Investigators heard certain metallic noises which cannot be further identified by source or sound.

On August 24, 1961 the Pontiac was observed parked at a bowling alley and coffee shop off Route 9. The back of the car contained what appeared to be boxes covered by a cloth or tarpaulin, but which cannot be more specifically identified. On the front seat of the car was observed a sixty-pound bag of Revere Sugar. Garry and Incardone were observed in the restaurant or coffee shop eating. Later the car was seen driven to the rear of 148 between 148 and 148½ Coburn Avenue, Worcester.

About Midnight the Pontiac was observed pulling up in front of Garry's house at 59 Highland Street, Hyde Park. Garry was driving, and Incardone was a passenger. They both got out of the car. Garry opened the trunk, and then entered his house. From the trunk of the car there was removed eleven five-gallon cans which appeared to be filled. Incardone made six trips to a door on the side of the house. He carried two five-gallon cans on each trip, except the sixth trip. On that trip he carried one can, having passed the others to somebody in the door-

116

way, and on the last trip he entered the house. He remained there at least forty-five minutes, and was not observed to leave.

On August 28, 1961 Garry drove Incardone in his car to Worcester. On Lake Ave. they met Giacomo Ventresca, who lives at 148½ Coburn Avenue, Worcester. Ventresca entered the car driven by Garry. The car was then driven into the yard to the rear of 148 and between 148 and 148½ Coburn Avenue. An observation was made that empty metal cans, five-gallon size, were being taken from the car owned by Garry, and brought into the premises at 148½ Coburn Avenue, which was occupied by Ventresca. Later, new cans similar in size, shape and appearance were observed being placed into the trunk of Garry's car while parked at the rear of 148 and in front of 148½ Coburn Avenue. The manner in which the cans were handled, and the sound[s] which were heard during the handling of these cans, were consistent with that of cans containing liquid.

On August 30, 1961, at about 4:00 A.M., an odor of fermenting mash was detected while Investigators were walking on the sidewalk in front of 148 Coburn Avenue. At the same time, they heard sounds similar to that of a motor or a pump coming from the direction of 148½ Coburn Avenue.

The foregoing information is based upon personal knowledge and information which has been obtained from Investigators of the Alcohol and Tobacco Tax Division, Internal Revenue Service, who have been assigned to this investigation.

/s/ WALTER A. MAZAKA

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE concurs, dissenting.

With all deference, the present affidavit seems hopelessly inadequate to me as a basis for a magistrate's

informed determination that a search warrant should issue.

We deal with the constitutional right of privacy that can be invaded only on a showing of "probable cause" as provided by the Fourth Amendment. That is a strict standard; what the police say does not necessarily carry the day; "probable cause" is in the keeping of the magistrate. *Giordenello* v. *United States,* 357 U. S. 480, 486–487; *Johnson* v. *United States,* 333 U. S. 10, 14. Yet anything he says does not necessarily go either. He too is bound by the Constitution. His discretion is reviewable. *Aguilar* v. *Texas,* 378 U. S. 108, 111. But unless the constitutional standard of "probable cause" is defined in meticulous ways, the discretion of police and of magistrates alike will become absolute. The present case, illustrates how the mere weight of lengthy and vague recitals takes the place of reasonably probative evidence of the existence of crime.

I.

Investigator Mazaka sought a warrant for the purpose of searching the premises at 148½ Coburn Avenue, occupied by respondent and his family, because, he averred, he had reason to believe that there was concealed on the premises an illegal still and other material connected with the manufacture of nontax-paid liquors. The grounds for this belief were recited in 12 paragraphs on an attached sheet, as reproduced in the Appendix to the Court's opinion, *ante,* p. 112.

The factual recitals comprise 10 paragraphs, each paragraph setting forth the alleged events of a single day, except that August 24, 1961, is dealt with in two paragraphs. Of these factual recitals more will be said in a moment. The first and last paragraphs of the 12 describe the sources from which the affiant has gained the information set forth in the factual paragraphs. These sources are, according to the first paragraph, three in

number: (1) "observations made by me"; (2) "information received officially from other Investigators"; and (3) "reports orally made to me [by other investigators] describing the results of their observations and investigation." In the last paragraph the affiant describes the sources of his information slightly differently: "The foregoing information is based upon personal knowledge and information which has been obtained from Investigators . . . ."

Of the 10 factual paragraphs eight describe trips said to have been made to and from the vicinity of 148½ Coburn Avenue by one Garry and one Incardone. On these trips, it is said, there were delivered to the vicinity of 148½ Coburn Avenue large quantities of sugar (four deliveries) and empty metal cans (two deliveries, on one of which respondent himself is said to have been a passenger in the car); on one occasion it was observed only that the car was "heavily laden." It is said that on two occasions Garry and Incardone were seen taking apparently filled cans into Garry's house, 59 Highland Street, from the Pontiac; on one such occasion the Pontiac, it is said, had been at Coburn Avenue earlier in the day, apparently making a sugar delivery. And, finally, it is averred that on one occasion seemingly filled cans were loaded into the Pontiac near 148½ Coburn Avenue, shortly after a delivery of empties to that address.

The "facts" recited in these eight paragraphs, it is said, permit the inference that a still was being operated on respondent's premises. But are these "facts" really facts? A statement of "fact" is only as credible as its source. Investigator Mazaka evidently believes these statements to be correct; but the magistrate must, of course, know something of the basis of that belief. *Nathanson* v. *United States*, 290 U. S. 41. Is the belief of this affiant based on personal observation, or on hearsay, or on hearsay on hearsay? Nowhere in the affidavit is the source

of these eight paragraphs of information revealed. In each paragraph the alleged events are simply described directly, or else it is said that certain events "were observed." Scarcely a clue is given as to who the observer might have been. It might have been the affiant, though one would not expect that he would so studiously refrain from revealing that he himself witnessed these events. The observers might have been some other investigators, though the affiant does not say so; yet in the two paragraphs next to be discussed the observers are prominently identified as investigators. Perhaps the ultimate source of most of these statements was one or more private citizens, who were interviewed by investigators, whose reports on these interviews came in due course to Investigator Mazaka, who then composed the affidavit. Perhaps many of the "facts" recited in the affidavit were supplied by an unknown informant over the telephone.

In most instances the language of the affidavit suggests that some investigator witnessed the alleged events. For example, the second paragraph begins: "On or about July 28, 1961, about 6:45 P. M., an observation was made covering a Pontiac automobile owned by one Joseph Garry." But the presumed investigator who may have been "covering" this automobile is in no way identified. There is no way of knowing whether the report of this alleged observation was made directly to the affiant or whether it went through one or more intermediaries.

Turning now to the remaining two "factual" paragraphs, we find it averred that "Investigators" smelled fermenting mash and heard metallic and other noises in the vicinity of 148½ Coburn Avenue. On August 18, it is said, investigators twice smelled mash between 4 and 5 a. m. as they walked on the sidewalk in front of and beside the house at 148 Coburn Avenue, which is apparently the house next to respondent's. The "Investigators" are not further identified. On August 30 at about 4 a. m., it

is averred, unidentified investigators detected the odor of fermenting mash while they were "walking on the sidewalk in front of 148 Coburn Avenue." The source of the odor is again not specified; but sounds heard at the same time, similar to the sounds made by "a motor or a pump," are stated to have come "from the direction of 148½ Coburn Avenue."

Such is the substance of the affidavit. No particular item of information is identified as within the first-hand knowledge of the affiant. Certain smells and sounds are explicitly described as having been directly perceived by unnamed investigators. The sources of all the other information are left to speculation.

The Court's unconcern over the failure of the affidavit to identify the sources of the information recited seems based in part on the detailed, lengthy nature of the factual recitals. The Court seems to say that even if we assume that only some small part of the information is trustworthy, still enough remains to establish probable cause. But I would direct attention to the fact that only *one* of the 12 paragraphs in this affidavit definitely points the finger of suspicion at 148½ Coburn Avenue: that is the paragraph describing the alleged events of August 28, 1961. In every other paragraph the recitals point no more to *148½* Coburn Avenue than they do to *148* Coburn Avenue. The August 28 paragraph is critical to the finding of the existence of probable cause for the search of 148½ Coburn Avenue. Yet the source of the information contained in that paragraph is in no way identified and it is therefore impossible to determine the trustworthiness of that crucial information.

## II.

A discussion of the legal principles governing the sufficiency of this affidavit must, unhappily, begin with *Draper* v. *United States*, 358 U. S. 307. There an officer

had been told by an informer, known to the officer to be reliable, that a man of a certain description would get off a certain train with heroin in his possession. The officer met the train, observed a man of that description getting off, and arrested him. The Court held that there was probable cause for the arrest. In *Jones* v. *United States,* 362 U. S. 257, the Court applied the holding in *Draper* to find an affidavit sufficient to establish probable cause for the issuance of a search warrant, even though the facts stated in the affidavit did not rest on the affiant's personal observations but rather on the observations of another. The Court held that an affidavit could rest on hearsay, *"so long as a substantial basis for crediting the hearsay is presented." Id.,* at 269. (Emphasis supplied.) In *Jones* the basis for crediting the informant's hearsay was: (1) the affiant swore that the informant had previously given information to him which was correct; (2) the affiant had been given corroborating information by other informants; and (3) the affiant was independently familiar with the persons claimed by the informants to be concealing narcotics in their apartment, and he knew them to have admitted to the use of narcotics.

I dissented from the decisions of the Court in these two cases, for the reasons which I set forth most fully in *Draper, supra,* at 314 *et seq.* But though I regard these decisions* as taking a view destructive of the guarantees of the Fourth Amendment, they are in any event clearly not dispositive of the present case. As I have already shown, the affidavit here does not set forth a single corroborating

---

*In these cases we might have drawn a clear, unmistakable line and held that hearsay evidence could not support a search warrant. But we did not so hold; instead we held that hearsay was competent for this purpose if there was "a substantial basis" for crediting it, thereby muddying the waters with considerations of corroboration and informer's reliability. Thus, by forsaking precise standards, the discretion of police and magistrates became less subject to judicial control.

fact that is sworn to be within the personal knowledge of the affiant. Moreover, there is not a single statement in the affidavit that could not well be hearsay on hearsay or some other multiple form of hearsay.

We are told, however, that it is at least clear that "Investigators" detected the smell of mash in the vicinity of 148½ Coburn Avenue. And the Court says: "Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number," *ante*, p. 111. But I would make *Taylor* v. *United States,* 286 U. S. 1, 6, my starting point, where the Court stated: "Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guarantees against unreasonable search." In *Johnson* v. *United States,* 333 U. S. 10, 13, the Court explained what the decision in *Taylor* meant: "That decision held only that odors alone do not authorize a search without warrant. If the presence of odors is testified to before a magistrate *and he finds the affiant qualified to know the odor,* and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant." (Emphasis supplied.) It is hardly necessary to point out that a magistrate cannot begin to assess the odor-identifying qualifications of persons whose identity is unknown to him. Nor is it necessary to belabor the point that these odors of mash are not ever stated in the affidavit to have emanated from 148½ Coburn Avenue.

### III.

The Court of Appeals was surely correct when it observed that "the affidavit leaves as a complete mystery the manner in which the Investigators discovered their information." 324 F. 2d 864, 869. Such being the case,

I see no way to avoid the conclusion of the majority below: "If hearsay evidence is to be relied upon in the preparation of an affidavit for a search warrant, the officer or attorney preparing such an affidavit should keep in mind that hearsay statements are only as credible as their source and only as strong as their corroboration. And where the source of the information is in doubt and the corroboration by the affiant is unclear, the affidavit is insufficient." *Id.*, at 869–870. That conclusion states a relatively clear standard of probable cause and is in sharp contrast to the amorphous one upon which today's decision rests.

In *Jones* v. *United States, supra,* this Court forgot, as it forgets again today, that the duty of the magistrate is not delegable to the police. *Nathanson* v. *United States,* 290 U. S. 41. It is for the magistrate, not the police, to decide whether there is probable cause for the issuance of the warrant. That function cannot be discharged by the magistrate unless the police first discharge their own, different responsibility: "to evidence what is reliable and why, and not to introduce a hodge-podge under some general formalistic coverall." 324 F. 2d, at 870. And see *Masiello* v. *United States,* 304 F. 2d 399, 401–402. *That* is the duty of the police—the rest is not for them.

I would affirm the decision below.