380 A.2d 914

**COMMONWEALTH of Pennsylvania**

v.

**Francis PURCELL, Appellant.**

Superior Court of Pennsylvania.

Argued June 13, 1977.

Decided Dec. 2, 1977.

---

5. We therefore need not reach appellant's other assignments of error.

Frank Robert Cori, Orwigsburg, for appellant.

Charles A. Bressi, Jr., Assistant District Attorney, Pottsville, with him Richard B. Russell, District Attorney, Pottsville, for Commonwealth, appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

Several issues have been argued but the only one that need be considered is the validity of the search warrant.

–1–

The search warrant was issued on the following affidavit of probable cause:

Being advised by a female wandering on the street in a dazed condition, and after walking, notified the police of a address of which she had come from, thereby viewing a marajuana plant on the window sill, and believing they having possession of additional controlled substance.

This affidavit is nonsense. Of course we must read a warrant in a common sense way, *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); but common sense cannot transmute nonsense into sense. Any issuing authority of the least independence of mind, *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), would have said to the affiant, "I can't make head or tail of this." That is what we should say. The law is not weakened but made stronger when it admits the obvious.

–2–

A skeptic will say that what is obvious may nevertheless not be correct. Let us therefore parse the affidavit.

"Being advised by a female wandering on the street in a dazed condition . . . ." There is nothing ambiguous about this. True, it has no subject; but also true, the subject is unmistakably implied: "[I, the undersigned affiant], being advised . . . . [etc]."

"And after walking . . . ." Here one senses trouble. Who did the walking? The dazed female or the affiant? Rules of grammar suggest the affiant: "I, the undersigned affiant, being advised . . . , *and* after walking . . ." Here, however, we had better not rely too much on the rules of grammar, so let us read on.

"And after walking, notified the police of a address of which she had come from . . . ." Does this mean that after walking, the *affiant* notified the police? Or does it mean that after walking, the *dazed female* notified the police? Who is referred to by "the police"? The affiant is a police officer. Does he mean that *he* notified the police, or that the dazed female, after walking, notified him as a *member* of the police? Perhaps it will help if we consider what the police were notified of: "a address of which she had come from." The dazed female is the person who would have known the address she had come from. It therefore seems fair, or at any rate possible, to read the affidavit as saying: "I met a female wandering on the street in a dazed condition. After she and I had walked together for awhile, she told me the address she had come from." So far, so good; perhaps after all the affidavit is not nonsense?

"Thereby viewing a marajuana plant on the window sill, and believing they having possession of additional controlled substance." With this, any hope of making sense of the affidavit vanishes.

Who saw the marihuana plant on the window, and who believed they had more marihuana? There are a number of possible answers to these questions, which is to say, a

number of possible interpretations of the affidavit. Of these possibilities, perhaps the most obvious are these three: (1) The *affiant* saw the marihuana plant, and having seen it, *he* believed that they (the persons living at the address where he saw the plant) had more marihuana; (2) The *dazed female* told the affiant that while she was at the address she had come from, *she* had seen the marihuana plant, and that therefore *she* believed that they (the persons living there) had more marihuana; or (3) The *dazed female* told the affiant that while she was at the address she had come from, *she* had seen the marihuana plant; having received this information, the *affiant* believed that the persons living there had more marihuana. The difficulty is that there is no way of choosing one of these possible interpretations in preference to either of the others. That is: Each interpretation assumes that a certain event occurred, the assumed event being different for each interpretation, but nothing is said in the affidavit on the basis of which one can choose one assumed event in preference to another assumed event.

Suppose one wishes to test the first possible interpretation, *i. e.*, that the *affiant* saw the marihuana plant, and having seen it, *he* believed that the persons living there had more marihuana. The event that this assumes is that after the affiant was told the address by the dazed female, he went to the address and saw the plant. Perhaps he did. However, nothing is said in the affidavit that warrants this assumption. In fact, one might well argue that if anything, the affidavit contradicts the assumption: If the affiant had gone to the address, would he not have said so in his affidavit?

If the *only way* the affiant could have learned of the marihuana was by going to the address *himself*, perhaps we could assume that in writing the affidavit he had inadvertently omitted saying that he had gone to the address. Here, however, it is plain that that is *not* the only way the affiant could have learned about the marihuana; more than that, it is not even the *most likely* way. The most likely (or, at least, an *equally likely*) way is the way assumed by the

second and third of the possible interpretations of the affidavit, *i. e.*, that the dazed female told him that while she had been at the address she had come from, she had seen the marihuana plant.

Now suppose that one discards the first possible interpretation (for example, on the reasoning that if the affiant had in fact gone to the address, he would have said so in his affidavit), and undertakes to choose between the second and third of the possible interpretations. Again, frustration follows directly. The second interpretation assumes that the dazed female made two statements to the affiant: that she had seen the marihuana plant at the address she had come from; and that she believed the persons who lived there had more marihuana. The third interpretation assumes that the dazed female made only the first of these two statements to the affiant, and that then, on the basis of it, the affiant decided that the persons living at the address she had come from had more marihuana. There is no way of choosing between these two different assumed events: it is just as likely that the dazed female made two statements to the affiant as that she made one.

–3–

I should have thought it enough to show that the affidavit was nonsense, and that no matter how we read it we cannot tell what events the affiant intended to describe. Since, however, this court is not in complete agreement let us consider the arguments advanced by the respective parties.

–a–

Appellant says that

the affidavit in the instant case indicates that some unidentified person, walking along the street in a dazed condition advised the police that she had come from a place where she had seen a marihuana plant on the windowsill and believed that the people at this place possessed additional controlled substances.

So interpreted, appellant argues, the affidavit must be held insufficient.

It will be observed that appellant's interpretation of the affidavit is the second of the three possible interpretations that have been discussed above. If for the sake of discussion we accept this interpretation as correct, it does indeed follow that the affidavit must be held insufficient.

Generally speaking, affidavits for search warrants are one of two sorts, depending on the sort of information they contain. (Of course, a given affidavit may be a combination of the two.) The first sort of affidavit is one in which the affiant police officer says that he has seen an event. The second sort of affidavit is one in which the affiant police officer says that although he has not himself seen the event, some one else has told him that the event has occurred. The second sort of affidavit is what is being discussed here: on appellant's interpretation of the affidavit, the affiant did not himself see marihuana inside appellant's residence but was told by the dazed female that she had seen it there.

Before a warrant may issue on the second sort of affidavit the issuing authority

must be informed of some of the underlying circumstances from which the informant [the dazed female] concluded that the narcotics [marihuana] were where he [she] claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed, [citation omitted], was "credible" or his information "reliable" [footnote omitted].

*Aguilar v. Texas*, 378 U.S. 108, 114–15, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964).

In other words, the issuing authority must by reference to the information in the affidavit be able to answer two questions: (1) Do I have enough information to warrant the belief that the informant *could* know what the officer says she told him she knew? And (2) If I do have enough such information, do I also have enough information to warrant the belief that she *did* know it?

Here there is not enough information in the affidavit to answer either question. True, the informant *could* know

there was a marihuana plant at appellant's residence, *if* she had come from there, *and if* she knew what a marihuana plant looked like. However, there is nothing in the affidavit to show that she *did* know what she said she knew. Indeed, the affidavit said she was "wandering on the street in a dazed condition." What does "dazed" mean? Even assuming that the "dazed female" knew the address she had come from—and plainly, she might not have if she were sufficiently "dazed"—still, there is not a single fact recited in the affidavit to warrant the belief that she knew what a marihuana plant looked like.

–b–

The Commonwealth says that

[if] the affidavit is read in a common sense manner, [citation omitted], then it can be seen that the police are the people who viewed the marihuana plant on the window sill and not the girl. The affidavit does not say that this female viewed the marihuana plant on the window sill. The affidavit indicates that the viewing of the marihuana plant came after they were informed by the girl from where she had come, thereby giving further support to the fact that it was the police who saw the marihuana plant. If the language, "Thereby viewing a marihuana plant on the window sill," is read in conjunction with the language, "and believing they having possession of additional controlled substances," it can be seen that the police are reciting this information, not the girl.

Commonwealth's Brief at 11–12.

Elsewhere in its brief the Commonwealth says:

[T]he affidavit shows more than just receiving information from a "credible person." The police saw some one on the street, a female citizen, they knew to whom they were speaking, and she was in a dazed condition. She then informed the police from where she had come. Certainly the police had a right to investigate the situation, and to see after her directions, from where she exactly did come. The police then went to the apartment, and it was

they, not her, who viewed the marihuana on the window sill. We then have direct police observation of criminal activity.

*Id.* at 11.

The lower court accepted this interpretation of the affidavit. Thus in its opinion the court says:

Here, testing the affidavit in accordance with the above principles of law [the court has just cited such cases as *United States v. Ventresca, supra*], it is clear the police themselves observed the criminal activity when they saw a marihuana plant on the window sill of defendant's premises. From this observation, they could reasonably infer that the owner and occupant of the building had in his possession additional controlled substances . . . .

. . . . .

The defendant erroneously attempts to make this test [of *Aguilar v. Texas, supra*] applicable . . . . However, the test applies only where information or statements concerning the criminal activity is obtained from an informant. Here the affiant obtained no information of criminal activity from the "dazed" female. Her only participation in the incident was that the police observed her on the streets of the borough in a dazed condition and she pointed to the building from which she had come. It was at this point that the police themselves observed a marihuana plant on the window sill, the essence of the criminal activity involved, and based on this information, which they themselves observed, they then proceeded to obtain a search warrant. Therefore, the two-pronged test [of *Aguilar*] has no application to this case.

Slip Opinion of Lower Court at 2–3.

These statements by the Commonwealth and the lower court require two responses.

–i–

The reader will no doubt have observed that the Commonwealth's and the lower court's interpretation of the affidavit

is the first of the three possible interpretations that have been discussed above. Whatever else may be said of this interpretation, it may not be said to be "clear." The Commonwealth and the lower court have made it clear by asserting that certain events occurred, and then reading the affidavit as though it described those events. The fallacy in this approach is that there is nothing in the affidavit that could persuade an independent issuing authority that the asserted events really did occur. Thus, the Commonwealth asserts that the police "knew to whom they were speaking." How does the Commonwealth know that this is what happened? More to the point, how could the issuing authority know it? There is nothing in the affidavit to suggest it. The lower court asserts that a somewhat different event occurred. Thus it says that "the affiant obtained no information of criminal activity from the 'dazed' female. Her only participation in the incident was that the police observed her on the streets . . . and she pointed to the building from which she had come. It was at this point that the police themselves observed a marihuana plant on the windowsill . . .. (emphasis added)." How does the lower court know that this is what happened? Again, more to the point, how could the issuing authority know it? There is nothing in the affidavit to suggest it.

It is wearisome to labor the point. Calling something "clear" does not make it so. The affidavit is not "clear." It is nonsense, for from reading it, no one can tell what really happened.

–ii–

If instead of reading the affidavit we read the transcript of the trial, however, we can tell what really happened; and this fact adds another, and regrettable, dimension to this case.

. The affiant did not testify at the hearing on the motion to suppress. The motion was denied without findings of fact or opinion, and so we cannot tell the basis of the denial. However, the affiant did testify during the trial.

Sergeant Edward Shearn testified that it was he who obtained the search warrant. N.T. 43. The sergeant testified twice: at the start of the trial, N.T. 4 *et seq.*, and later outside of the jury's hearing incident to the Commonwealth's offer of certain statements made by appellant to the police, N.T. 38 *et seq.* Because there were fewer interruptions it will be convenient to quote the sergeant's later testimony; it did not differ in any substantial respect from his earlier testimony.

The district attorney directed the sergeant's "attention . . . to the evening of January 30th about 9:30 . ." N.T. 38. (This was an inadvertence for March 30th, which was the date in the indictment and the date in the application for the search warrant.) The sergeant said that at that time he and Officer Petri were with a juvenile girl named Cindy Krisa, and that the three of them went to the residence at 30 South Mahanoy Street in Frackville. The sergeant continued:

Q. What happened when you went to the door?

A. Officer Petri knocked at the door. We were admitted by Mr. Purcell.

Q. Were you on the porch at that time?

A. Yes, we were.

Q. When you say you were admitted, that means you were admitted into the house?

A. We knocked on the door, and Mr. Purcell opened it.

THE COURT: He is the defendant, Mr. Purcell?

A. The defendant, yes.

Q. Did Mr. Petri go into the house at that time?

A. Yes, he did.

Q. With you?

A. That's correct.

Q. Did the young lady go in with you?

A. Yes, she did.

Q. And what was said there at that time between you and the defendant or anybody else and the defendant?

A. Well, I asked Mr. Purcell if he knew the identification of the girl, where she lived, how she got there, if he knew who brought her there, and how she got in the condition that she was in at that particular time.

Mr. Cori: This is irrelevant to this hearing your Honor.

Mr. Bavolack: It's all part of the res gestae.

THE COURT: Well, he's getting up to the statements he made. Which statements are you challenging? See, that's the difficulty with your application. You don't say what statements you are challenging. He has no knowledge as to what you are challenging. That's why it must state specifically what evidence should be suppressed, and that's your obligation initially although the burden of persuasion is on him.

Q. And what was his reply to that?

A. Mr. Purcell said that she came with other people who ran out of the house when we knocked on the door. They went out the back door.

Q. And did you have any further conversation with Mr. Purcell at that time as to whether this young lady took medication or not?

A. That's correct. I asked him if he seen her take any medication, any pills, any alcohol, or anything that would get her in a state of mind where she wouldn't function properly. Her eyes were dilated also. Mr. Purcell answered he didn't see her take anything or do anything there that they were . . . He opened the refrigerator. There were milk and butter and things of that sort in it, nothing, a half a bottle of beer was open; and there was about a half a bottle of beer left there.

THE COURT: Listen, I don't want everything. Just go to statements, statements, statements.

A. Well, then he brought the marihuana plant to me, your Honor.

THE COURT: He brought it on his own?

A. He handed me the plant; and said, this is the only thing that's in this apartment, the marihuana plant.

THE COURT: He said what?

A. This is the only drug in the place or thing that here on the premises, this marihuana plant, which he handed to me.

THE COURT: Then what did you do?

A. I then informed Mr. Purcell . . . As I said, I read him his rights.

After stating what rights he informed appellant of, the sergeant continued:

THE COURT: Can you explain what a consent search was?

A. He was then taken to the police station, your Honor.

THE COURT: Oh, you didn't make a search then?

A. Not at that point, no, your Honor. I just took the plant. I told Mr. Purcell that he was under arrest; and I filled out a form, a consent search, which I have there. I read it to Mr. Purcell, and he refused to sign it.

THE COURT: Consent form. Where was that?

A. I think it's in my case, your Honor.

Q. Do you have it there, sir?

THE COURT: Get everything out that he did.

Mr. Cori: Well, this don't have any relevancy to any statements.

THE COURT: I don't know what's on that form.

A. This is for a consent search, your Honor, which he . . .

THE COURT: I don't know what you have in there. I don't know if you recite the *Miranda* Warnings again or what you do. I have to see it.

All right, he didn't sign that. There nothing on about the *Miranda* Warnings. Let the record so indicate.

Q. Did you arrest him at that time at the home?

A. I placed him under arrest. That's when I read him his rights.

Q. Did you tell him that if he started to answer questions . . .

    Mr. Cori: Objection, it's leading.

A. . . . he could stop at anytime?

    Mr. Cori: Objection, it's leading.

    THE COURT: The objection's overruled.

Q. Whether or not you told him he could stop at anytime if he started to answer any questions.

    Mr. Cori: Objection. It's still a leading question.

    THE COURT: Objection overruled.

Q. Now, was there any other conversation then on the way to the police station for the first time?

A. Not to my knowledge.

Q. And when you got to the police station, the only . . . The conversation concerned a search, a search warrant. Is that correct?

A. Consent search.

Q. Was there discussion then as to whether or not he would consent to a search warrant?

A. That's correct.

Q. At first he said I consent?

A. Well, he seemed favorable.

Q. But at a later time he would not agree. Is that correct?

A. When it was filled out, I read it to him. He refused to sign it.

Q. You obtained a search warrant and went back to the premises. Is that right?

A. That's right.

Officer Petri also testified. In response to questions by the district attorney, he said:

Q. Officer, I direct your attention to March 30, 1975, and whether or not you were in the vicinity of 30 South Mahanoy Street in Frackville?

A. Yes, I was.

Q. Who were you with?

A. Officer Shearn.

Q. Were you in a car?

A. Yes, sir, a police cruiser.

Q. What transpired while you were in that area?

A. We were traveling south of Mahanoy Avenue when we seen a young girl standing in a open garage.

Q. In an open garage?

A. Yes.

Q. Where was that open garage with reference to this property?

A. Right next to 30 South Mahanoy Street.

Q. What did you do as a result of seeing her there?

A. We stopped and got out and asked who she was, and we didn't get no response from her.

Q. As a result of this conversation, what did you and Officer Shearn do?

A. She lead us to 30 South Mahanoy Street.

Q. Who went there?

A. I, Sergeant Shearn, and this young juvenile.

Q. Did you make an entry into the home?

A. No, sir, we wrapped [sic] first.

Q. Who came to the door?

A. Mr. Purcell. He is sitting right over there (indicating).

Q. The defendant?

A. Yes, sir.

Q. At that time did he permit you to enter?

A. The young girl walked in, and Officer Shearn stated that did she come out of here; and Mr. Purcell said, yes, come in. In the meantime, two persons ran to the rear; and I come down off the porch and went to the back of the home, but I missed the people running out. Then I come back around again, and Officer Shearn and the young girl was in the home already, was inside.

Q. Did you enter the home at all?

A. Yes.

Q. You had entered?

A. Yes.

Q. Did you come out of the same door that you entered?

A. Yes.

Q. What did you observe there at that time outside?

A. Nothing.

Q. You said you saw two people there?

A. Yes, there was two people in the house; and they ran out the back door.

Q. Did you see them run out the back door?

A. Yes, they ran out, yes. I didn't see them running out through the back door, but they ran to the rear of the apartment.

Q. You saw them at the rear of the apartment?

A. Yes, they ran to the rear of the apartment.

Q. Then you were out of the apartment for a short time. Is that correct?

A. Yes.

Q. When you returned to the apartment, what did you do or see?

A. I walked in and I seen Sergeant Shearn with a sort of a red clay pot in his hand.

Q. How long were you away at that time, how many minutes?

A. Well, I would say approximately about two minutes.

Q. What else transpired there at that time?

A. Well, he had this pot; and it had a green vine growing up through it; and it appeared to me as a marihuana . . .

Mr. Cori: Objection.

THE COURT: The objection's sustained. Disregard what it appeared to be.

Q. What transpired then as a result of any of this?

THE COURT: The Jury will disregard that statement?

Q. If anything?

A. Sergeant Shearn put Mr. Purcell under arrest.

Q. Anything else?

A. No, we left.[1]

Therefore, if we believe the sergeant's and officer's testimony at trial—and why should we not?—the events that *in fact* led to the search warrant being obtained were: The sergeant and officer saw a young girl standing in a garage, and asked her who she was. [*I. e.,* contrary to the Commonwealth's argument, the police did not "kn[o]w to whom they were speaking."] The girl was dazed, and what she replied is not clear. Sergeant Shearn started to testify to what she replied, but an objection was sustained. Officer Petri said "we didn't get no response from her," but when asked, "as a result of this conversation, what did you and Officer Shearn do?", he said: "She lead us to 30 South Mahanoy Street." [*I. e.,* we still do not know whether, as the Commonwealth says, she told the police the address, or whether, as the lower court says, she pointed it out.] At the address Officer Petri knocked on the door, appellant answered, and the sergeant, officer, and girl went inside. The sergeant questioned appellant about the girl's identity and condition. Appellant replied that he had not seen the girl "take anything or do anything . . . . He opened the refrigerator . . . . *then he brought the marihuana plant to me* [the sergeant] . . . ." (emphasis added). [*I. e.,* contrary to both the Commonwealth's and the lower court's statements, the police did *not* see the marihuana plant *on a windowsill* while they were outside the premises.]

In other words, the Commonwealth has argued, and the lower court has held, that the affidavit should be interpreted as reciting events that if we believe the notes of testimony, in fact did not occur. Since neither the Commonwealth nor

1. Officer Petri's description of the girl may be supplemented by reference to Sergeant Shearn's first testimony. Then the sergeant said that the girl "wasn't normal", N.T. 4, "her eyes were dilated", *id.,* "we stopped and questioned her, Your Honor. The girl couldn't tell us her name. She didn't know where she was. We asked her how she got there . . . . [an objection to what the sergeant said she said was sustained]," N.T. 5.

the lower court suggests we should not believe the notes of testimony, that is the same as arguing, and holding, that the affidavit should be interpreted as false. It is bad enough to uphold a conviction when the affidavit is *nonsense*; to uphold it by interpreting the affidavit as *false* is a desperate resort indeed.

The judgment of sentence is vacated and a new trial awarded.

JACOBS and CERCONE, JJ., concur in the result.

WATKINS, President Judge, and VAN der VOORT, J., dissent.

PRICE, J., did not participate in the consideration or decision of this case.