399 A.2d 1074

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Julio ANDUJAR, Jr.**

Superior Court of Pennsylvania.

Submitted June 12, 1978.

Decided March 16, 1979.

Charles M. Guthrie, Jr., Assistant District Attorney, Reading, for Commonwealth, appellant.

Frederick O. Brubaker, Reading, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

VAN der VOORT, Judge:

This appeal is by the Commonwealth from an Order of the lower court granting the defendant-appellee's pretrial application for the suppression of evidence seized pursuant to a warrant. Our review of the record, and applicable law, leads us to conclude that the lower court erred in granting the suppression motion in this case.

The sole issue presented is whether the description of the premises to be searched was sufficiently specific in light of all of the other facts of record. The search warrant was sought by police after they received information from an informant that he had purchased drugs from the appellee. The search warrant contained the following description of the premises to be searched.[1]

"(1) 609 N. 9th St., Reading, Berks County, Pa. being a 2½ story row home w/yellow brick front."

The lower court heard testimony concerning the suppression issues, and with counsel and the parties, viewed the actual premises which was the situs of the search. The following findings of fact by the lower court, we believe, correctly summarize the physical characteristics of the premises to be searched:

"(2) . . . From the exterior on 9th Street, the premises resembles an ordinary row dwelling. To the left of the front door are three different bell openings, and at the time of the view by the Court, only one had a bell plunger. But there is no doubt that the existence of a plate containing positions for three bell plungers was there. To the left of the door was a metal mailbox attached to the wall and a letter slot in the door. The premises, it is stipulated, possessed separate gas and electric meters, one for each of the two separate living quarters.

"(3) When one proceeds through an alleyway to the rear of the building, at the left, and as part of the rear room on the first floor, is a doorway which contained no name or any appliance for determination by a person being outside desiring to enter; in other words, no bell or knocker. The interior of the premises contains two separate living quarters to the extent that the front portion of the first floor and the front portion of the second floor have a kitchen,

1. The warrant also specified that a nearby garage, the body of the appellee, and a vehicle were to also be searched. No issue is raised in this case as to these parts of the warrant.

bathroom and bedrooms and are occupied by Julio Andujar, not the defendant. The rear of the building contains separate living quarters to the extent that there are bedrooms, bathroom and kitchen. So that, without any question, the two units could be qualified as separate living quarters.

"(4) On the first floor, there is a door leading from the alleged first floor apartment to the rear, from the living room. The door was still in place but boarding had been placed across the opening, and apparently, under the officer's testimony, that was there at the time of the search.

"(5) On the second floor of the premises, there was a doorway from which the door was removed, at the time of our inspection, and a rough board enclosure filled in the door space which, upon my pounding upon it, seemed to be fixed. We are satisfied that this situation did not exist at the time of the raid, and we accept the testimony of Lt. Yerger that he did leave by that doorway.

"(6) At the time of the search, the front portion of the premises, both first and second floors, were occupied by Julio Andujar, Sr. and, apparently, members of his family. At the same time, the rear of the premises were occupied by the defendant and members of his family."

It is apparent that the appellee and other members of his family lived in a dwelling which had been converted, to some extent, *in its interior*, into two living areas. It appears that they were not totally segregated, however, as there was free access from the front of the house to the rear of the house on the second floor. It is significant, however, that the record shows little to determine from the *exterior*, that the building constituted more than a single dwelling unit. From the outside, as the lower court found, an observer would view "an ordinary row dwelling." The building bore a single street number, and a single mail box. The only indication that these premises were other than a single

dwelling were three different bell openings, but only one had a bell plunger to the left of the single front door.

Based upon the above-stated facts of record, the lower court concluded that suppression was mandated by this Court's decision in *Commonwealth v. Johnson*, 229 Pa.Super. 182, 323 A.2d 26 (1974) (Opinion by Hoffman, J., Former President Judge Watkins, Present President Judge Cercone and Van der Voort, J., dissenting). We find the lower court's holding to be an unwarranted extension of the *Johnson* decision, and otherwise find the *Johnson* rationale inapplicable in the instant case. In *Johnson*, the building in question was a three story row house in Chester, but it contained "numerous" dwelling units. In that case, police obtained a warrant for a building ". . . under the control of Johnnie Carter, a/k/a John Johnson", although they knew that that person was not the same as the defendant in *Johnson*. It was also revealed in *Johnson* that the informant's information to police had furnished them with a specific location in the multiple unit dwelling where the unlawful conduct, a gambling operation, was being conducted. In the instant case, while the affidavit attached to and in support of the warrant states that the informant advised police he had seen suspected drugs in a "rear" bedroom, the officers testified that prior to the search, they had no indication that there was more than one dwelling unit inside the structure. In fact, on the one occasion when police surveillance was used to corroborate the informant's information, police watched the informant enter the *front* door of the structure and later exit with a supply of drugs which had not been in his possession prior to his entry. In these circumstances, we hold that *Johnson* is not applicable.

We are required to examine the facts in search warrant cases in a commonsense, and not hypertechnical, manner. *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). The record in this case shows diligent efforts by police officers to obtain substantial information about a drug sales operation, by thorough investigation, and to present that information to an issuing authority, under

oath, in support of their request for a warrant. These diligent efforts did not disclose the existence of *internal* structural divisions in the building, which by all outward signs, and reasonably available information, appeared to be a single family residence. We find, under these conditions, that the warrant was sufficiently specific in describing the site to be searched.

The order of the lower court granting appellee's pre-trial application for suppression of evidence is reversed, and the case remanded for trial.

SPAETH, J., files a concurring opinion.

JACOBS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, concurring:

Andujar's Sr.'s, apartment was in the front of the building, Andujar, Jr.'s, in the rear. The warrant authorized the search of Jr.'s apartment ("Name of owner, occupant or possessor of said premises to be searched . . . Julio Andujar, Jr."). The police did search Jr.'s apartment, but before they did, they entered and started to search Sr.'s apartment, only desisting and proceeding to Jr.'s apartment when Sr. protested.[1]

The majority holds that the search of Sr.'s apartment was legal. This holding, I submit, is in error. Contrary to the majority, there were indications on the exterior of the building that showed that it had been divided into apartments. As the lower court found: there were three different bell openings (the fact that only one worked is irrelevant); there were two places for mail—a mailbox attached to the wall, and a letter slot in the door; and there were two

---

1. To quote the detective: "I started up the steps with Mr. Andujan, Sr. He was trying to convince me that I was in the wrong place. He was really trying to stop me from searching his residence. I told him that I had a legal right, that I had a search warrant. He said, "But this is an apartment." And he explained that his son lived in the rear. By the time we got to the top of the second floor stairway, he had me convinced, and I came back down." N.T. 9.

gas and two electric meters. N.T. 30. On these facts, *Commonwealth v. Johnson*, 229 Pa.Super. 182, 323 A.2d 26 (1974), is in point, and not distinguishable.

I nevertheless concur in the result reached by the majority. If the police had found something in Sr.'s apartment, *Sr.* would have standing to object to its use in evidence against *him*. The record is not entirely clear, but as I read it, the police found nothing in Sr.'s apartment; the contraband was in Jr.'s apartment. Assuming, however, that the police did find some contraband in Sr.'s apartment, still, Jr. has no standing to object to its use in evidence against him. *Commonwealth v. Yucknevage*, 257 Pa.Super. 19, 390 A.2d 225 (1978).

The lower court should therefore have denied Jr.'s motion to suppress the contraband seized by the police, whichever apartment it was seized in.