STATE OF CONNECTICUT *v.* JOHN CAPONIGRO

FILE No. CR 7-8616

STATE OF CONNECTICUT *v.* THOMAS J. PETROCELLI

FILE No. CR 7-8617

APPELLATE DIVISION OF THE CIRCUIT COURT

Argued April 17—decided September 8, 1967

*James M. S. Ullman,* of Meriden, for the appellants (defendants).

*Francis M. McDonald,* deputy chief prosecuting attorney, for the appellee (state).

Kosicki, J. The defendants were tried together on separate informations. Defendant Caponigro was charged in two counts of pool selling in violation of § 53-295 of the General Statutes, and in one count of conducting a baseball pool in violation of § 53-296. This count is not before us on appeal. Defendant Petrocelli was accused on the same two counts of pool selling as his codefendant. Both were found guilty as charged and have appealed. The appeals were joined by order of court. Practice Book §§ 606, 1023; Maltbie, Conn. App. Proc. § 124. Although the combining of the appeals resulted from a motion by the defendants rather than on stipulation of the parties, it was the order of the court that brought about the joinder, without any objection from the state, and the appeals lend themselves to this treatment. See Maltbie, loc. cit.

Before arraignment, pursuant to § 54-33f, the defendants filed a motion to suppress evidence allegedly obtained as a result of the execution of an illegal search warrant.[1] The defendants' principal claims were (1) lack of probable cause for issuance of the warrant under § 54-33a; (2) insufficiency of the affidavits; (3) hearsay evidence providing the sole basis for the warrant; (4) statement in the affidavit of mere conclusions and not of facts supporting them; (5) defective description of what was to be searched; (6) no description of the persons to be searched; (7) illegal execution by officers; (8) vagueness; and (9) search of a person on premises for which the warrant had been issued but who was not connected therewith or described in the affidavit. At the same time, the defendants filed a motion to disclose the name of the informant alluded to in the affidavit.

---

[1] The wife of defendant Caponigro was also a party to this motion, but after a joint trial with the other two defendants she was found guilty and sentenced, and has not appealed.

Both motions were initially heard by the court, *Chernauskas, J.,* on arguments only, on November 23, 1965. The motion to disclose the name of the informant was denied and was not pursued further, nor was its denial assigned as error on appeal. The abandonment of this claim reflects favorably on the perspicacity of counsel, because nowhere did it appear that such a disclosure would be relevant and helpful to the defense or essential to a fair determination of the cause. For a comprehensive and penetrating analysis of this question, reference is made to *McCray* v. *Illinois,* 386 U.S. 300, 303–14. We shall, therefore, give the matter of nondisclosure of the informant no further consideration.

The motion to suppress was also denied, without prejudice, and continuance granted for a hearing on evidence solely on the issue whether the officers, in executing the warrant, extended and exceeded the authority given them by the warrant. As to the other issues, it was agreed that they were matters of law and would be submitted on briefs. The burden was on the defendants to establish the facts on which they claimed the evidence should be suppressed. *State* v. *Mariano,* 152 Conn. 85, 91, cert. denied, 380 U.S. 943.

At a hearing on January 28, 1966, the only witnesses presented by the defendants were Officer Hourigan of the Meriden police department and Trooper Dewey, Detective Dennerstein and Detective McDonnell of the state police. Detectives McDonnell and Dennerstein had signed and sworn to the affidavit and application for the search and seizure warrant issued on October 11, 1965, by Judge Chernauskas. It is this warrant and the actions taken thereunder which are attacked by the motion to suppress. No finding was requested of Judge Chernauskas, who denied the motion to suppress, and no finding was made. The finding of the trial judge,

*Herman, J.,* following a full hearing on the merits, after pleas of not guilty had been entered, contains nothing which bears on the validity of the warrant. The facts found and the conclusions reached relate only to the execution of the warrant. No motion to correct this finding was made; therefore, it must stand. Because of the general assignment that the court erred in concluding on all the evidence that the defendants were guilty of the crimes charged beyond a reasonable doubt, we have examined the entire transcript of evidence. Practice Book §§ 981, 989 (6), 995.

Neither hearing developed any evidence to show that the statements of the affiants were untrue; and the judge whose duty it was to pass upon the sufficiency of the application and affidavit was not entitled to discredit what the affiants had declared under oath. *McCray* v. *Illinois,* supra, 313–14. The application and the search warrant were offered in evidence. In substance, the affiants stated the following facts and circumstances: On October 11, 1965, Detectives McDonnell and Dennerstein presented a written and sworn application and affidavit to Judge Chernauskas in which they, as affiants, requested a search and seizure warrant, stating that they had probable cause to believe that "records, papers, horse bets, monies and other gambling paraphernalia, is [sic] possessed, controlled, designed or intended for use as a means of committing the crime of Pool Selling, Section 53-295 of the General Statutes." The affiants relied, for their belief, on an anonymous letter, received by the state police department, stating that John Caponigro of 39 Fiesta Heights, Meriden, was a bookie and that Thomas Petrocelli was "in the lower level of the house taking action on the telephone from runners and bettors." The affidavit also contained the following information and statement of the affiants. On

October 4, 1965, Trooper Coffey of the state police had informed McDonnell that he, Coffey, had been told by an informant that a man had been seen in Caponigro's cellar spending a lot of time on the telephone and receiving a great many telephone calls. Both defendants had an arrest record, one for frequenting a gaming house and the other for carrying a weapon in a motor vehicle and for breach of the peace.

Following the receipt of this information, the state police began their own independent investigation. On October 4, McDonnell observed, at about 3:45 p.m., a motor vehicle, with Connecticut registration No. 747-405, parked in front of 39 Fiesta Heights. According to the records of the motor vehicle department, this registration for a black 1961 Ford sedan listed as owner Thomas Petrocelli of 3 Foster Court, Meriden. On October 6, at about 10:15 a.m., McDonnell checked 39 Fiesta Heights and no vehicles were parked near the home. At about 11:45 a.m., he observed the car described above parked at the address mentioned. At approximately 4:15 p.m., the vehicle was still there. At about 4:30 p.m., it was no longer at 39 Fiesta Heights. On October 7, at about 9:15 p.m. (sic), McDonnell saw the mentioned car driving away from 39 Fiesta Heights with a male operator later identified as Thomas Petrocelli. He parked in front of Filippone's Shell Station, 142 Springdale Avenue, Meriden, and remained inside for about five minutes. Next he entered Alnic's Variety Store, 143 Lewis Avenue, Meriden, where he stayed about five minutes. At about 10:20 a.m., the vehicle was again observed parked outside Alnic's Variety Store and, at about 11:15 a.m., Petrocelli left the store. At 11:25 a.m., Petrocelli's car was seen parked in front of 39 Fiesta Heights and he was observed walking up the driveway toward the house. He was seen

by McDonnell driving away from the house at about 4 p.m. On October 11, at about 11:20 a.m., Detectives McDonnell and Dennerstein saw Petrocelli get out of an unidentified motor vehicle and walk into the side door of 39 Fiesta Heights.

The first four claims in the motion to suppress are without merit. The judge before whom the affiants appeared with their application and affidavit could reasonably find probable cause for issuing the warrant and that there was ample surveillance and investigation, by the affiants and others of the state police, to support the hearsay evidence which prompted and impelled detective action. Probable cause connotes less than the quality and quantum of evidence which would justify a conviction; and a finding of probable cause may rest on evidence not legally competent in a criminal trial and even upon hearsay, if there is a substantial basis for crediting it. *United States* v. *Ventresca,* 380 U.S. 102, 107. The law, of course, makes void a search warrant which is based "upon a mere affirmation of suspicion and belief without any statement of adequate supporting facts." *Nathanson* v. *United States,* 290 U.S. 41, 46. And in *State* v. *Allen,* 155 Conn. 385, 391, the search warrant was held illegal because "[n]either the recital that the affiant had information from a reliable informant nor the statement that there had been surveillance, without sufficient indication of the result of that surveillance, gave the judge of the Circuit Court adequate information to determine for himself whether probable cause for the issuance of the warrant existed." In the instant case, we are of the opinion that the observed pattern of Petrocelli's apparently meaningless meanderings and his presence for regular, long and specified periods of time at the home of Caponigro, where Petrocelli did not reside, would reasonably lead to the belief that the stops made by him were for pur-

poses of picking up bets or wagers and that his presence in Caponigro's house lent strong credence to the informants' reports, and reasonably accounted for the belief, based on police experience, that the place was used for pool selling in contravention of § 53-295. It is common knowledge that such operations are not carried on openly, nor the evidence necessary to convict publicly displayed.

Here, the uncontested statements in the affidavit make it abundantly clear that the warrant was issued on probable cause supported by oath within the intendment of the fourth amendment to the federal constitution. There appear to be present the "underlying circumstances" upon which the belief that probable cause exists is founded. See *Aguilar* v. *Texas,* 378 U.S. 108, 114; *Jones* v. *United States,* 362 U.S. 257, 269. "[A]ffidavits for search warrants, such as the one involved here, must be tested and interpreted by magistrates and courts in a common-sense and realistic fashion. They are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area." *United States* v. *Ventresca,* supra, 108. "[W]hen a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a common-sense, manner. Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Id., 109 (citing *Jones* v. *United States,* supra).

It is evident from a reading of the recitals in the affidavit that the place to be searched was described with adequate particularity as to the address and

physical description of the premises, the persons and the objects to be found, the crime being committed, and other essentials necessary to render the warrant free of mere suspicion or conjecture. We are of the opinion that the warrant and supporting affidavit were not insufficient because of defective description or vagueness as asserted in the defendants' motion. *Hornig* v. *Bailey,* 50 Conn. 40.

To meet the demands which the defendants assert in their brief as the minimal essentials of a valid warrant would nearly require that the affiants and the magistrate be endowed with extrasensory perception to discern with exactitude what should be found on the premises for which the search warrant was issued. "Obviously any reliance upon factual allegations necessarily entails some degree of reliance upon the credibility of the source. See, e.g., *Johnson* v. *United States,* 333 U.S. 10, 13. Nor does it indicate that each factual allegation which the affiant puts forth must be independently documented, or that each and every fact which contributed to his conclusions be spelled out in the complaint. Compare *United States* v. *Ventresca,* 380 U.S. 102. It simply requires that enough information be presented to the . . . [magistrate] to enable him to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play the further steps of the criminal process." *Jaben* v. *United States,* 381 U.S. 214, 224.

The remaining allegations of the motion to suppress, namely, illegal execution of warrant and search of a person on the premises who was not named in the warrant, should properly be considered in connection with the finding of the trial judge and the assignment of errors. The finding, which is not subject to correction, discloses the following:

Thomas McDonnell, a detective with the state police, was assigned to the criminal intelligence unit thereof for a period of four years. McDonnell's duties were to gather evidence in gambling cases and to make arrests for violations of the gambling laws of the state of Connecticut. On October 11, 1965, McDonnell, with a search and seizure warrant, entered the premises of 39 Fiesta Heights, in Meriden, which had been owned and occupied for approximately three years by the defendant Caponigro and his wife as a family residence. Upon entering the premises, the officer first met the defendant Caponigro, to whom he identified himself. The officer advised Caponigro that he had in his possession a search and seizure warrant, but Caponigro chose not to examine it. He unlocked a door leading to a basement recreation room. Upon entering the recreation room, McDonnell found the defendant Petrocelli standing in the center of an adjoining room, usually used for storage. A telephone had been concealed by Petrocelli under a sofa in the basement. This telephone was capable of being put into operation by attaching it to a wall jack in the area of a bar in the recreation room.

McDonnell met and talked with Lena Caponigro, the wife of the defendant John Caponigro, in the kitchen. While in the act of leaving the kitchen, Lena Caponigro took from her sweater pocket three pieces of paper which appeared to contain considerable writing of names, initials, numerals and other data. One of the written sheets, a state's exhibit, was a recording of horse-race bets for August 11, 1965, including tallies of money owed to or by the person accepting or recording the wagers. This exhibit was a written record commonly maintained in the business of pool selling and contained a record of horses, tracks that they ran on, names of the horses, the amounts of money wagered, and the

agent who accepted the wagers. Another of the written sheets, an exhibit, was also a tally sheet containing a running total of moneys either owed to the pool seller or owed by him to another from wagering activities. The third of the three sheets, an exhibit, was also a tally sheet indicating the names of agents or bettors with the amounts of money either owed to them or due from them from wagering activities. The three tally sheets were found by Lena Caponigro the day before while she was in her garage.

The tally sheets were written and prepared by the defendant Petrocelli. He accepted bets in the cellar of the Caponigro home at 39 Fiesta Heights. Petrocelli was employed by the defendant John Caponigro to take bets. Caponigro paid Petrocelli a commission of 10 percent of the weekly profits earned from the taking of bets by him, and the compensation averaged between $100 and $140 per week. The bets were received by Petrocelli over the telephone which was found concealed in the cellar of the Caponigro premises. John Dewey, a trooper with the state police department, attached the telephone to the wall jack, placing it in operation. Immediately after the telephone was put in operation, the officer received seventeen calls, between 1:50 p.m. and 3:10 p.m. Of the total calls received, six persons placed wagers with the officer. In some of the calls, but not in all of them, the party making the call asked for Tom. The party asked for by the callers as Tom was the defendant Thomas J. Petrocelli. Michael Conroy, a trooper with the Connecticut state police department, was assigned to the detective bureau and the criminal intelligence unit for several years. The wallet of the defendant John Caponigro contained a tally sheet indicating amounts of moneys owed by agents or bettors to the keeper of the records, who was the defendant John

Caponigro. Caponigro admitted and acknowledged that he employed Petrocelli for the taking of bets. Petrocelli came to and occupied the cellar room of the Caponigro premises every day, excluding Sundays, arriving at noon and staying until 4 or 4:30 p.m.

Upon the foregoing finding of subordinate facts, the court concluded that the defendant John Caponigro on August 11 and October 11, 1965, owned, possessed and maintained premises for the purpose of making, recording and registering wagers; and that on those dates, by himself and through his agent, he performed the same acts in violation of § 53-295. As to Petrocelli, the court's conclusions were that on those dates he kept, managed, maintained and occupied premises for the purpose of making, recording and registering wagers, and that on the same dates he made, recorded and registered bets, thus violating § 53-295.

With the exception of the ruling on the motion to suppress and the general assignment, the defendants' assignments of error consist almost entirely of asserted errors in the court's conclusions and in rulings on evidence. We cannot consider the claim that certain subordinate facts were found without evidence, for no motion to correct the finding was made. Practice Book § 981. This omission, however, does not disadvantage the defendants, for we have read the entire transcript and find that there was evidence, if credited, to support the subordinate facts as found, as well as the conclusions reached, by the court.

The defendants have assigned error in seven rulings of the court in the admission of testimony or exhibits offered by the state. In the first of these, error is claimed in admitting in evidence certain papers which were identified by the officer, as an

expert witness, as being records of wagers and of gambling activities in connection with horse racing. These papers were turned over voluntarily by the wife of Caponigro, who disapproved of the activities of these two defendants. Mrs. Caponigro is not a party to this appeal. If there is any claim of some violation of her constitutional rights, we must point out that these rights were personal to her and the present defendants have no standing to assert what she apparently had waived or declined for reasons best known to herself. "In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." *Jones* v. *United States,* 362 U.S. 257, 261. Mrs. Caponigro not only gave the police the papers, which were admissible evidence of pool selling, but also volunteered a statement as to the use of the premises in violation of § 53-295. This was admitted not as proof of facts contained therein but simply as admissions made by her before the trial. For this purpose they were not essential, because, of all the defendants, she was the only one who chose to testify, and her testimony was sufficient to prove the allegations of the informations against the defendants. There was no error in the court's overruling the defendants' objection.

We need not consider at length the next claimed error, as to the admission of two copies of the Armstrong Daily which were used as evidence to show that the horses running at certain tracks corresponded to entries of bets on one of the exhibits, which was a record of the bets turned over to the police by Mrs. Caponigro. The witness, McDonnell, who by reason of his police assignment showed

proficiency in clarifying and interpreting such data, established the relevance between the Armstrong sheets and the evidence already in, so as to render the evidence comprehensible, thus making these particular exhibits admissible. The defendants gain nothing by this assignment.

In their sixth assignment, the defendants assert error in the admission of testimony on incriminating statements made by these defendants to Detective McDonnell after they had been shown the exhibits and statement of Mrs. Caponigro and after they had been placed under arrest and warned of their rights. The claim is that such statements, called confessions by the defendants, were not admissible until the corpus delicti had been established. We question, without deciding, the claim of the defendants as to the order of proof. The state offered this testimony of McDonnell subject to its being connected up with other extrinsic evidence which, together with the statements, would tend to prove the commission of the delict by these defendants. Our rule, as stated in *State* v. *Tillman,* 152 Conn. 15, 20, is that "the corpus delicti consists of the occurrence of the specific kind of loss or injury embraced in the crime charged." Thus, in a homicide case, the court points out, "the corpus delicti is the fact of the death, whether or not feloniously caused, of the person whom the accused is charged with having killed or murdered. . . . Incidentally, . . . while the requisite corroborative evidence must be material and substantial, it may be circumstantial in nature." Ibid.; note, 45 A.L.R.2d 1316, 1333. The court properly admitted this evidence. The occurrence of the delict had already been sufficiently established by the three betting records in evidence, the betting wagers received by one of the officers over the telephone in the basement of Caponigro's home, and the baseball betting "lines" and tally sheet

either handed over or found on Caponigro. Also, the telephone calls were for "Tom." The first name of Petrocelli was Thomas, and he was usually called Tom.

In their seventh claim of error, the defendants assert that evidence of telephone calls received by the police during their presence on the premises was inadmissible for the reasons stated in the motion to suppress. We have already decided that the search and seizure were not illegal. It may also be observed that "[t]he testimony concerning the telephone calls was offered, not to prove that the statements made in them were true, but as evidence of betting activity. Such evidence is admissible, not as an exception to the hearsay rule, but because it is not within that rule. *State* v. *Tolisano,* 136 Conn. 210, 214 . . . ." *State* v. *DeNegris,* 153 Conn. 5, 12; *State* v. *Rafanello,* 151 Conn. 453, 455. This assignment of error is without merit.

The eighth claim of error, concerning the admission of the buff-colored piece of paper recording baseball bets, we cannot consider. As we noted earlier, no appeal was taken from the judgment on this count; consequently, there is nothing before us. In the ninth claim, error is assigned in the admission of a betting tally sheet given to the police by Caponigro or taken from his wallet, after arrest and due warning of his rights. The reason assigned is that contained in the motion to suppress, namely, that the incriminating tally sheet was tainted as a result of an illegal seizure. In addition to the views we have already expressed as to the validity of the search warrant and its execution, we may add that even if the warrant had been illegal, the officers would have been justified in making the arrests, without a warrant, and in searching the persons of the defendants, after the officers had observed the activities which had occurred and were occurring, in

their presence, and which reasonably indicated that the place was being operated by the defendants for the purpose of pool selling in violation of § 53-295. See § 6-49; *State v. Allen,* 155 Conn. 385, 392. The tally sheet was properly admitted.

The final assignment claims error in the admission, through the testimony of Trooper Conroy, of evidence as to statements and conversations of the two defendants while they were both present. We shall consider this assignment together with the general assignment of finding guilt on insufficient evidence. The transcript of evidence, which we examine on this last assignment, may be summarized as follows: Trooper Conroy had been a state policeman for twelve years and nine months. He was assigned to the criminal intelligence unit to compile information on gambling activities and to participate in gambling raids. He had been with the detective division for three and one-half years and in his present assignment for one year. After the police had entered under authority of the search warrant, which was shown to Caponigro but who declined to examine it, Caponigro opened his wallet and showed the trooper the "baseball line" referred to above. With the baseball slip was another small white piece of paper, an exhibit, which the witness identified as a tally sheet, and on which were written the names of bettors who owed wagers to Caponigro. The total owed was $12,437. "These articles or papers could have no function or purpose except in connection with gambling . . . ." *State v. Fico,* 147 Conn. 426, 431. In the presence of Trooper Conroy, Caponigro told Detective McDonnell that Petrocelli worked for him. Counsel objected on the ground that before any admissions could be received there had to be "substantial evidence of a crime on the dates alleged in the information." That was the sole ground for the objection. As we have said

before, the objection was unsound under the ruling of *State* v. *Tillman,* 152 Conn. 15, 20, and the tally sheet was properly admitted in evidence. Then followed a conversation between the two defendants and Detective McDonnell. Caponigro said he paid Petrocelli 10 percent of the net of all the money which was taken in on this operation. Petrocelli said he averaged between $100 and $140 per week. Caponigro said he had been in the business of accepting bets about four or four and one-half months. This testimony was corroborated by Daniel Reardon, a member of the state police department who was present when the foregoing information was elicited from the defendants. In addition, Reardon recalled that Petrocelli said he copied down the bets for Caponigro and was the "writer."

We have already referred to the voluntary testimony of Mrs. Caponigro, who was commended by the court for her honesty. She had found written paper records in her garage which were identified and introduced in evidence as gambling sheets. She further testified that Petrocelli regularly came to the premises and spent his time in the cellar where the police found the concealed telephone and the wall connection to which it could be connected at will. It was over this telephone that seventeen calls were received by the police while they were there on October 11, 1965. Of these, six were bets on horse races, supposedly placed with Petrocelli.

Upon all of the evidence, the conclusion of the court that the defendants were guilty of the crimes charged beyond a reasonable doubt cannot be disturbed.

There is no error.

In this opinion DEARINGTON and KINMONTH, Js., concurred.