[Civ. No. 25737.   First Dist., Div. Four.   Nov. 21, 1968.]

NORMA MARIE CAVE, Petitioner, v. THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

[Civ. No. 25777.   First Dist., Div. Four.   Nov. 21, 1968.]

HIGINIO MONTOYA LUCERO, Petitioner, v. THE SUPERIOR COURT OF SAN MATEO COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

(Consolidated Cases.)

Harrington, Knight & Smith, Clarence B. Knight and George P. Eshoo for Petitioners.

No appearance for Respondent.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr.. Assistant Attorney General, and Robert R. Granucci, Deputy Attorney General, for Real Party in Interest.

DEVINE, P. J.—Writ of prohibition is sought to prevent the prosecution of petitioners, who are charged with receiving stolen property. Motion to suppress evidence as having been obtained by an illegal search was made and was denied.

The search was made pursuant to a search warrant which was issued upon an affidavit of a police officer. The affidavit is good in form and unassailable in substance. It recites the details of five burglaries in South San Francisco, in which specifically described television sets, radios, a gun, and other items were stolen. It recites the statements by named persons that males had been carrying television sets, as many as 25, as well as other objects such as hand tools, into the premises at 216 Third Lane, South San Francisco; also, that an offer to sell at low prices a sander and a television set had been made to a named person by a man whom he saw to come out of the described premises about two weeks later. Altogether, an excellent showing is made. The affidavit recites that because the goods had been seen to be delivered to the premises at nighttime, and were not observed to leave during the daytime, the affiant believes that the stolen property is being removed from 216 Third Lane at night; wherefore, nighttime search is requested.

The search warrant describes the premises and the things to be seized, and commands peace officers to make "immediate search" of the premises in the daytime or nighttime. It was issued December 4, 1967.

The search was not conducted, however, until December 11, 1967. On motion in the superior court under section 1538.5 of the Penal Code to suppress the evidence, the officer who was in charge of the search testified that the premises to be searched were approximately three blocks from the police station in South San Francisco, and while he had been in the area of the said premises daily from the date of the issuance of the search warrant, he had not conducted the search pursuant to the said warrant because he was looking for further evidence and because he wanted to serve the warrant when there were people in the house. The second of the expressed reasons, concerning the presence of people in the house, however, appears to have been a limited one because the officer related this reason to the day of the issuance of the warrant, saying: "I didn't know if anybody occupied the dwelling at that particular time on that particular day." He did not testify that persons were not present at other times during the seven-day period, but, indeed, testified that surveillance was going

on periodically and that on December 8 he saw a man carry a transistor radio into the house. Thus, the primary, if not the sole reason for the delay was the expectation of finding additional property; and respondent, conceding this, seeks to justify the search as permissible at any time within ten days.

From the transcript of the municipal court hearing, it appears that all of the goods offered in evidence had been purloined in burglaries of two separate homes in Palo Alto on the day of the search, December 11, 1967, except three small rings which had been stolen from the home of a resident of South San Francisco on November 4, 1967, about a month before the issuing of the search wrrant. The burglary of November 4 had been reported to the police, but was not one of those described in the affidavit for the search warrant.

The officer had seen petitioner Lucero carrying many of the items of evidence into the premises at 216 Third Lane a few minutes before he demanded the search pursuant to the warrant which he exhibited to the occupants, including petitioners.

The question is whether a peace officer may delay the execution of a search warrant in which immediate search is directed for a period of seven days, for the purpose of apprehending additional evidence, including evidence of crimes not yet committed when the warrant was issued, within the described premises. Petitioners contend that the search so conducted is illegal. Respondent argues that the search and return are valid if they are accomplished within the time described in Penal Code section 1534 which, so far as relevant, reads: ''A search warrant must be executed and returned to the magistrate who issued it within ten days after its date; after the expiration of this time the warrant, unless executed, is void.''

There is no California case on the point. Although section 1534 does not specify any time except the ten-day limit, section 1529 of the Penal Code requires that the warrant be substantially in the form described in the section, and this form includes the following command by the magistrate to the peace officer: ''. . . you are therefore commanded . . . to make *immediate* search on the person . . . (or in the house situated . . .) for the following property: . . . and if you find the same or any part thereof, to bring it *forthwith* before me. . . .'' (Italics supplied.) Thus, the search is to be immediate, the search is to be for that property described in the affidavit which has also been described in the warrant, and the

return is to be made forthwith. The warrant herein complies with the section. It commands immediate search. Moreover, it commands that such immediate search be in the day or night-time.

It is impossible for us to read this statute as permitting a search the time of which is at the officer's discretion within the maximum, a search which is timed by the officer to produce property which he believes was brought to the premises subsequent to the issuing of the warrant, and the return to which is, of course, also delayed. The statute speaks of immediacy. It does not admit of delay that is calculated on the making of a more fruitful search than that which was described to the magistrate.

The terms of section 1529 and those of the warrant which was issued seem compelling to us. The words "immediate" and "forthwith" lose their true meaning if they be thought to relate to any time at all within ten days. But because of the newness and the importance of the question, we shall elaborate our reasoning.

Respondent argues that if the ten days be not allowed, section 1534 becomes relatively if not wholly meaningless. But that section has to do with a maximum time, and declares that after this time an unexecuted warrant is void. It does have meaning in absolutely nullifying the unexecuted warrant. It is not in conflict with section 1529, which requires promptness. In some cases, physical difficulties may delay execution. Section 1534 was enacted in 1872. To execute a warrant and to make a return in mountainous counties in the 1870's might take a ten-day period. Even now it is possible that circumstances will justify use of the maximum time. It is to be observed, too, that the authorized search may be of a *person* as well as of a place, under section 1529, and it may take days to discover the person.

Although a peace officer has important duties, these are ministerial, not judicial. (*Vallindras* v. *Massachusetts Bonding & Ins. Co.,* 42 Cal.2d 149, 154 [265 P.2d 907].) When a warrant, conformably with the statute, commands an immediate search, the officer may not decide on a delayed one.

The purpose of description of the property to be taken would be thwarted if the officer might delay execution until the property were removed or new property brought into the described premises. The warrant, with its careful description of the property to be seized, would in effect be converted to a mandate to seize not only that property but whatever else

might be found within the premises at any time within the ten-day period, at the officer's choice, which was suspected to be contraband. The warrant, despite its formal precision, would, by its being withheld until property not described in it were available, become a blanket authorization resembling the abhorred writs of assistance which were often used in colonial times. In fact, in this particular case, on the one hand, none of the property admitted in evidence was described in the affidavit; and on the other hand, not a single item of the property described in the affidavit is listed in the inventory accompanying the return.

The objection of the Americans to the writs of assistance, particularly in Massachusetts where they were frequently employed, was to their generality. (2 Legal Papers of John Adams (1965) 114, 115.) The opposition to these writs, led by John Adams and James Otis, had far-reaching results. It was one of the early causes of the American Revolution. John Adams went so far (perhaps somewhat too far) as to say that when Otis challenged the writs "then and there the child Independence was born." (Colbourn, The Lamp of Experience (Chapel Hill 1965) 69.) He wrote to his wife, Abigail, on July 3, 1776, the day after the Resolution of Independence had been passed: "When I look back to the year 1761, and recollect the argument concerning writs of assistance in the superior court, which I have hitherto considered as the commencement of this controversy between Great Britain and America, and run through the whole period, from that time to this, and recollect the series of political events, the chain of causes and effects, I am surprised at the suddenness as well as greatness of this revolution. Britain has been filled with folly, and America with wisdom. At least, this is my judgment." (Koch, The Selected Writings of John and John Quincy Adams (N.Y. 1946) 59.) The use of the writs of assistance brought about the Fourteenth Article of the Declaration of Rights in the Constitution of Massachusetts of 1780, which was drafted by Adams, an article which is remarkably similar to the Fourth Amendment to the Constitution of the United States which became effective in 1791. Indeed, Otis' argument in 1761, in the Writs of Assistance,* played a part in the doctrine of judicial review later to be accepted in *Marbury* v. *Madison* (1803) 5 U.S. (1 Cr.) 137 [2 L.Ed. 60], because Otis' contention was that even an Act of Parliament was void if it was against the unwritten constitution and against nat-

---

*Quincy (Mass. 1761) pp. 51-57.

ural equity. (Corwin, *The "Higher Law" Background of American Constitutional Law,* 42 Harv.L.Rev. 365, 398-399.)

We do not imply that the delayed execution of this single warrant is as portentous as was the harassment by the "swarms of officers" referred to in the Declaration of Independence. We do find a significant relationship between those writs which had such an impact on our early history and this one which, because of lapse of time, became general in effect although precise in form. This relationship is a potent consideration in our decision that section 1534 of the Penal Code is but a declaration of a maximum time and is not a definition of the immediate search required by section 1529 of the Penal Code.

Respondent makes the point that searches authorized by warrant are to be preferred, whenever possible, to searches otherwise supported, such as those made incident to an arrest. (Respondent remarks that an arrest in this case would have been justified even prior to the search; whereupon incident search would have been allowed. Actually, however, the search was not made on that ground, nor does respondent seek to justify the search as an incident to arrest.) The proposition stated by respondent is correct. Searches under warrant are to be encouraged. (*Jones* v. *United States,* 362 U.S. 257, 270 [4 L.Ed.2d 697, 707, 80 S.Ct. 725, 78 A.L.R.2d 233]; *United States* v. *Ventresca,* 380 U.S. 102, 106-107 [13 L.Ed.2d 684, 687-688, 85 S.Ct. 741].) The use of the search warrant is notably rare. (Landynski, Search and Seizure and the Supreme Court (1966) 116; Collings, *Toward Workable Rules of Search and Seizure: An Amicus Curiae Brief,* 50 Cal.L. Rev. 421, 456.)

But the predilection of the law for searches made under warrant is valid only if the searches are conducted according to law and according to the mandate of the warrants themselves. (See *People* v. *Keener,* 55 Cal.2d 714, 723 [12 Cal.Rptr. 859, 361 P.2d 587].) A search that is not so conducted, even though it purports to be done under a warrant, is a misuse of the statutory, if not of the constitutional, process. The warrant in such a case effects a deceptive assertion of authority upon the person on whom it is served and purportedly gives an undeserved protection to the officer.

Although a holding to the terms of the statute, section 1529 of the Penal Code, may be of assistance, as in this case, to accused persons, it is not without its possible benefit to the victims of crime. If property which has been taken in burg-

laries is removed from the premises of a fencing operation after the operation has become so far subject to reasonable suspicion as to have brought about the issuance of a search warrant, the owners of the property may lose it permanently.

Besides this, the delay may facilitate perpetration of additional burglaries, as apparently happened here. Not only is there danger that stolen property from fresh burglaries may not be delivered to the particular place of search which is suspected and thus may be lost to the owners, but, also, there is the peril of violence in the perpetration of burglaries. This is not only a conclusion which can be reached by common knowledge, but also is recognized by statute, section 189 of the Penal Code, which declares that murder perpetrated in a burglary or attempted burglary is murder of the first degree. The mandate of the magistrate for immediate search, therefore, often will have a preventative as well as a remedial effect.

Cases from other states, wherein the few decisions are diverse, are not helpful. Many were decided before *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933], and are not concerned with whatever constitutional problems there may be. As to interpretation of statutes, we have found no persuasive analysis of statutes comparable to our sections 1529 and 1534. Of the federal cases, in *Spinelli* v. *United States*, 382 F.2d 871, it was held that the ten-day allowance in rule 41(d) of Federal Rules of Criminal Procedure is the maximum, and that the ''forthwith'' referred to in rule 41(c) requires execution within a reasonable time, to be decided on a case-by-case basis (p. 885). In *Spinelli*, a two-hour delay was held not unreasonable under circumstances in which contraband might have been destroyed had the warrant been executed before the suspect was about to leave the premises. There was a dissent on another ground, deficiency of the affidavit. Certiorari was granted by the United States Supreme Court on March 4, 1968 (390 U.S. 942 [19 L.Ed.2d 1130, 88 S.Ct. 1025]), and on May 27, 1968, was modified to limit review to the question of constitutional validity of search and seizure (391 U.S. 933 [20 L.Ed.2d 853, 88 S.Ct. 1834]).

In *Mitchell* v. *United States*, 258 F.2d 435 [103 App.D.C. 341], there is the curious fact that both the main opinion and the concurring one, in their reference to prompt execution of a search warrant, are engaged in obiter dictum because the point admittedly was not available to appellant, for he had

not made it part of his motion to suppress evidence. In the *Mitchell* case, the majority deems the ten-day limit to be the definition of "forthwith." Circuit Judge Bazelon, concurring on the ground that appellant had waived by his omission, is of the opinion that the officer must make the search at the earliest reasonable opportunity.

Let a writ of prohibition issue.

Rattigan, J., and Christian, J., concurred.

The petition of the real party in interest for a hearing by the Supreme Court was denied January 22, 1969.