DECISION AND JUDGMENT ENTRY
{¶ 1} April D. Oros appeals from one of her convictions and her multiple sentences in the Pickaway County Common Pleas Court. On appeal, Oros contends that the trial court erred when it denied her motion to suppress certain evidence seized from her home because the State failed to show probable cause for the issuance of the search warrant. Because we find that probable cause did exist for the issuance of the search warrant, we disagree. Oros next contends that the Supreme Court of Ohio's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, prohibited the trial court from imposing consecutive sentences. Because we have rejected the premise of Oros' argument in other cases, and because the Supreme Court of Ohio's recent decision in *Page 2 State v. Bates, ___ Ohio St.3d ___, 2008-Ohio-1983 also refutes her argument, we disagree. Oros next contends that the "rule of lenity" prohibited the court from imposing consecutive sentences. Because we have rejected Oros' argument in other cases, we disagree. Finally, Oros contends that the trial court imposed `severe' sentences because she appealed a prior decision of the same court. Because we cannot clearly and convincingly find that the sentences are otherwise contrary to law, we disagree. Accordingly, we affirm the judgment of the trial court.
 I. {¶ 2} In January 2006, Circleville police, along with officers from the U.S. Route 23 Drug Pipeline Task Force ("Task Force"), began investigating Oros for suspected drug activity. With the help of confidential informants, officers from the Task Force conducted three controlled buys of crack cocaine from Oros.
 {¶ 3} Sergeant Robert Chapman of the Circleville Police Department submitted affidavits to a municipal court judge in support of multiple search warrants. (See attached APPENDIX ONE for details of three of the affidavits.) The affidavits outlined the controlled buys of crack cocaine made by the confidential informants in conjunction with the Task Force officers. Further, officers received numerous reports from "sources" that Oros dealt drugs from a bar where she worked (the Matchbox Tavern) and that Oros stored large quantities of drugs in her home on Ruth Avenue until she could sell them.
 {¶ 4} The judge found probable cause to sign all of the search warrants. The officers executed the warrants for: (1) the Matchbox Tavern; (2) the apartment located *Page 3 
on the second floor of the Matchbox Tavern; (3) Oros's residence on Ruth Avenue; (4) a 2001 Lexus registered to Oros; (5) a 1999 Buick registered to Oros's father, Daniel Oros. Sergeant Chapman later prepared, obtained (from the same judge), and executed an additional search warrant for the Ruth Avenue property after discovering a shed on the back of that property.
 {¶ 5} As a result of the search of the Ruth Avenue residence, officers found 53.2 grams of crack-cocaine in Oros' purse and 22-23 grams of crack-cocaine in other parts of the home.
 {¶ 6} A Pickaway County Grand Jury indicted Oros for six counts of trafficking crack cocaine, in violation of R.C. 2925.03(C)(4)(c), and one count of possession of crack cocaine, in violation of R.C. 2925.11(C)(4)(e). Later, the grand jury indicted her on a separate charge of trafficking ecstasy, a violation of R.C. 2925.11(C)(5)(b). The court consolidated the two cases, involving the eight alleged offenses.
 {¶ 7} Oros entered not guilty pleas. She filed a motion to suppress, requesting that the court suppress evidence obtained from the searches made pursuant to the warrants because the judge lacked probable cause to sign the warrants. The court denied the motion and the cases proceeded to a jury trial.
 {¶ 8} The jury returned verdicts of guilty for five of the offenses and not guilty for three of the offenses. The court accepted the guilty verdicts and imposed a 14 year prison term as follows: (1) ten years for possession of crack cocaine in the amount of more than twenty-five grams, but less than one hundred grams in violation of R.C. 2925.11, a first degree felony; (2) one year for trafficking in crack cocaine in an amount *Page 4 
more than one gram, but less than five grams, in the vicinity of a school, in violation of R.C. 2925.03, a third degree felony; (3) one year for trafficking in crack cocaine in an amount more than one gram, but less than five grams, in violation of R.C. 2925.03, a fourth degree felony; (4) one year for trafficking in crack cocaine in an amount more than one gram, but less than five grams, in the vicinity of a school, in violation of R.C. 2925.03, a third degree felony; and (5) one year for trafficking ecstasy in violation of R.C. 2925.11(C)(5)(b). The court ordered the five sentences to run consecutive to each other and imposed a total fine of $20,000.
 {¶ 9} Oros appeals her first degree felony conviction (possession of crack cocaine in the amount of more than twenty-five grams, but less than one hundred grams) and her five consecutive sentences. She asserts the following four assignments of error: I. "THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'S MOTION TO SUPPRESS EVIDENCE AS TO THE SEARCH OF HER RESIDENCE CONTRA THE OHIO AND FEDERAL CONSTITUTIONS[.]" II. "A COMMON PLEAS COURT LACKS JURISDICTION TO IMPOSE CONSECUTIVE SENTENCES FOR THE COMMISSION OF MULTIPLE FELONIES[.]" III. "THE RULE OF LENITY CODIFIED IN R.C. 2901.04(a) REQUIRES THE IMPOSITION OF MINIMUM AND CONCURRENT SENTENCES FOR THOSE PERSONS WHO COMMITTED THEIR OFFENSES PRIOR TO THE ANNOUNCEMENT OF THE OPINION IN STATE V. FOSTER (2006), 109 OHIO ST.3D 1, 2006-OHIO-856[.]" And, IV. "APPELLANT'S RIGHT TO A FAIR SENTENCE IS DENIED WHEN THE TRIAL COURT ENHANCED HER SENTENCE *Page 5 
FOR IMPROPER REASONS THEREBY VIOLATING THE OHIO AND UNITED STATES CONSTITUTION."
 II. {¶ 10} Oros contends in her first assignment of error that the trial court erred when it denied her motion to suppress.
 {¶ 11} Our review of a decision on a motion to suppress presents mixed questions of law and fact. State v. McNamara (1997),124 Ohio App.3d 706, 710, citing United States v. Martinez (C.A.11, 1992),949 F.2d 1117, 1119. At a suppression hearing, the trial court is in the best position to evaluate witness credibility. State v. Dunlap (1995),73 Ohio St.3d 308, 314. Accordingly, we must uphold the trial courts findings of fact if competent, credible evidence in the record supports them. Id. We then conduct a de novo review of the trial courts application of the law to the facts. State v. Anderson (1995),100 Ohio App.3d 688, 691; State v. Fields (Nov. 29, 1999), Hocking App. No. 99CA11.
 {¶ 12} Oros asserts that probable cause did not support the issuance of a warrant to search her home. As such, she maintains that the trial court should have suppressed the evidence seized as a result of the warrant.
 {¶ 13} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution provide the "[t]he right of the people to be secure * * * against unreasonable searches and seizures * * *." Both constitutional provisions further provide that "no warrants shall issue, but upon probable cause, supported by *Page 6 
oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized." Id.
 {¶ 14} Probable cause is a lesser standard of proof than that required for a conviction, such as proof beyond a reasonable doubt or by a preponderance of the evidence. State v. Young (2001),146 Ohio App.3d 245, 254, citing State v. George (1989), 45 Ohio St.3d 325, 329;Illinois v. Gates (1983), 462 U.S. 213, 235. Probable cause only requires the existence of circumstances that warrant suspicion. Id. Thus, "the standard for probable cause requires only a showing that a probability of criminal activity exists, not a prima facie showing of criminal activity." Id., citing George at 329. Hearsay may serve as the basis for the issuance of a warrant as long as there is a substantial basis for crediting the hearsay." State v. Underwood, Scioto App. No. 03CA2930, 2005-Ohio-2309, ¶ 16, citing United States v. Ventresca
(1965), 380 U.S. 102, 108.
 {¶ 15} Crim. R. 41(C) provides the procedure for issuing a search warrant. In deciding whether to issue a search warrant, the issuing magistrate must scrutinize the affidavit in support of the warrant. Then the magistrate must make a practical, common sense decision, given all the circumstances set forth in the affidavit including the veracity and basis of knowledge of persons supplying hearsay information, whether "`there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" George at paragraph one of syllabus, quoting Gates at 238-239.
 {¶ 16} Here, the municipal court judge found probable cause to issue the search warrant after the State provided him with multiple affidavits. *Page 7 
 {¶ 17} Oros claims that the State's affidavits failed to establish whether the sources cited therein "have ever worked with law enforcement on previous occasions and the history of whether or not the sources have ever provided credible and/or reliable information in the past."
 {¶ 18} In deciding whether an affidavit submitted in support of a search warrant sufficiently supports a finding of probable cause, a reviewing court must give great deference to the issuing magistrate's determination. George at paragraph two of the syllabus; see, also,Gates at 237. "Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."Ventresca at 109; Gates at 237, fn. 10; George at paragraph two of the syllabus. A reviewing court simply decides whether the affiant presented enough facts to allow the issuing magistrate or judge to independently determine the existence of probable cause. Gates at 239.
 {¶ 19} In Aguilar v. Texas (1964), 378 U.S. 108, and Spinelli v.United States (1969), 393 U.S. 410, the Supreme Court of the United States set forth a two-pronged test for determining whether an informant's tip establishes probable cause for issuance of a warrant. To make a valid finding of probable cause under that test, a magistrate must be informed of: (1) the basis of the informant's knowledge; and (2) sufficient facts to establish either the informant's veracity or the reliability of the informant's information. Aguilar at 114;Spinelli at 413. *Page 8 
 {¶ 20} In Gates, supra, the court later favored a "totality of the circumstances" test for probable cause instead of merely applying the rigid Aguilar-Spinelli test, but specifically found that theAguilar-Spinelli elements remain important guideposts. The court stated that as far as "relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."Gates at 233 (Citations omitted.) As a result, this court has stated, "While an informant's veracity, reliability, and basis of knowledge are relevant considerations in the totality of the circumstances analysis, they are not to be viewed as rigid requirements that must be demonstrated before a search warrant may be issued." State v. Remy, Ross App. No. 03CA2731, 2004-Ohio-3630, ¶ 25. Instead, "they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is `probable cause' to believe that contraband or evidence is located in a particular place." Id.
 {¶ 21} With regard to the basis of an informant's information, "[a] common and acceptable basis for the informant's information is his personal observation of the facts or events described to the affiant."State v. Karr (1975), 44 Ohio St.2d 163, 165; United States v.Harris (1971), 403 U.S. 573. Moreover, the Supreme Court of the United States has found that an informant's first-hand observation and explicit, detailed description of alleged wrongdoing entitles his tip to greater weight than might otherwise be the case. Gates at 234. *Page 9 
 {¶ 22} Here, we find that competent, credible evidence supports the trial court's probable cause finding. That is, sufficient facts set forth in the multiple affidavits allowed the issuing judge to independently find the existence of probable cause with regard to the search of the Ruth Avenue address. Sergeant Chapman's affidavit establishes that confidential informants, in conjunction with the Task Force, made three separate controlled buys of crack cocaine from Oros, the most recent being the day before the search warrants were issued. Sergeant Chapman relied on information given to him by Task Force officers in detailing the controlled buys that occurred in March 2006 and May 2006. On one of those occasions, surveillance officers saw Oros leave her home on Ruth Avenue and drive directly to the location of the sale. Further, the officers' sources indicated that they were present at Oros' residence" and "saw large of amounts of crack cocaine in baggies and firearms." The officers' sources stated that Oros kept drugs at the residence until she distributed them. More detailed information of the storage of drugs at the home was provided in the affidavit, i.e., that Oros kept bulk amounts of crack "in a in-floor safe * * * located in her bedroom" and always kept a large quantity of crack cocaine in a Crown Royal bag that she always carries on her person.
 {¶ 23} When considering the totality of the circumstances, the municipal court judge could have and residential parent reasonably concluded that the informant was sufficiently knowledgeable regarding the information conveyed to the officers and recited in the warrant. Therefore, based on this information, the municipal court judge had probable cause to issue the warrant. Consequently, the trial court did not err when *Page 10 
it denied Oros' motion to suppress the evidence seized from the execution of the warrant.
 {¶ 24} Accordingly, we overrule Oros' first assignment of error.
 III. {¶ 25} Oros contends in her second assignment of error that the trial court had no jurisdiction to impose consecutive sentences for the commission of multiple felonies following the Supreme Court of Ohio's decision in State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856.
 {¶ 26} We have rejected Oros' contention in prior cases. "Nothing inFoster * * * suggests that the Court eliminated consecutive sentencing."State v. Scott, Pickaway App. No. 07CA5, 2007-Ohio-3543, ¶ 9; State v.Thompson, Washington App. No. 06CA43, 06CA50, 2007-Ohio-2724, ¶¶ 12-13. In Scott, we stated that even though Foster declared portions of Ohio consecutive sentencing statutes unconstitutional, those portions were severed. Id. at ¶ 9. Following Foster, "trial courts retain discretion to impose consecutive sentences without stating their reasons for doing so." Id., citing Foster at paragraph seven of the syllabus.
 {¶ 27} The Supreme Court of Ohio has recently confirmed our conclusion in State v. Bates, ___ Ohio St.3d ___, 2008-Ohio-1983. TheBates court stated:
 The severance and excise of former R.C. 2929.14(E)(4) and former R.C. 2929.41(A) in their entirety by Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph four of the syllabus, leaves no statute to establish in the circumstances before us presumptions for concurrent and consecutive sentencing or to limit trial court discretion beyond the basic "purposes and principles of sentencing" provision articulated and set forth in R.C. 2929.11 and 2929.12. As a result, the common law presumptions are reinstated. 73 American Jurisprudence 2d *Page 11 
(2007), Statutes, Section 271 (the repeal of a statute that abrogates the common law operates to reinstate the common-law rule). Such a conclusion is also consistent with the perspective of the Ohio Criminal Sentencing Commission, which opined that after Foster, judges have broader discretion within felony ranges to impose definite and consecutive sentences. Diroll, A Decade of Sentencing Reform, A Sentencing Commission Staff Report (Mar. 2007) 19. In particular, "[j]udges are no longer guided to give concurrent sentences unless circumstances argue that consecutive sentences are more appropriate." Id.
 Accordingly, the trial court now has the discretion and inherent authority to determine whether a prison sentence within the statutory range shall run consecutively or concurrently, and we hold that the trial court may impose a prison sentence to be served consecutively to a prison sentence imposed on the same offender by another Ohio court. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, paragraph seven of the syllabus; Stewart [v. Maxwell (1963)], 174 Ohio St. [180,] at 181, 22 O.O.2d 116, 187 N.E.2d 888.
Id. at ¶¶ 18-19.
 {¶ 28} Accordingly, we overrule Oros' second assignment of error.
 IV. {¶ 29} Oros contends in her third assignment of error that the rule of lenity requires minimum and concurrent sentences for persons committing offenses before the announcement of the Supreme Court of Ohio's opinion in Foster. As such, Oros claims that the trial court erred when it imposed consecutive sentences.
 {¶ 30} We reject Oros' argument for the same reasons that we rejected it in other cases. See State v. Ellis, Scioto App. No. 06CA3071,2007-Ohio-2177, ¶¶ 39-40; State v. Kerns, Scioto App. No. 06CA3124,2007-Ohio-3881, ¶ 10; State v. Riggins, Scioto App. No. 07CA3145,2007-Ohio-4814, ¶¶ 9-10. *Page 12 
 {¶ 31} The rule of lenity is codified in R.C. 2901.04(A), and states that "[s]ections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." R.C. 2901.04(A).
 {¶ 32} The "`rule of lenity' applies only where there is ambiguity in or conflict between * * * statutes." Ellis at ¶ 40, citing State v.Arnold (1991), 61 Ohio St.3d 175, 178; United States v. Johnson (2000),529 U.S. 53, 59 ("[a]bsent ambiguity, the rule of lenity is not applicable to guide statutory interpretation"). "Because Foster severed the portions of the sentencing statutes, which violated theSixth Amendment, and because there is no ambiguity in or conflict between statutes, the rule of lenity has no application here." Id., citingState v. Coleman, Sandusky App. No. S-06-023, 2007-Ohio-448 at ¶ 23;State v. Moore, Allen App. No. 1-06-51, 2006-Ohio-6860 at ¶ 12.
 {¶ 33} Accordingly, we overrule Oros' third assignment of error.
 V. {¶ 34} Oros contends in her fourth assignment of error that the trial court erred when it enhanced her sentence. She claims that the trial court improperly punished her for appealing a condition of her community control sanctions in an earlier case. See State v. Oros, Pickaway App. No. 01CA7, 2001-Ohio-2574.
 A. Our Standard of Review {¶ 35} The Foster court held that the portions of Ohio's statutory sentencing scheme that required sentencing courts to make factual findings or give its reasons for imposing maximum, consecutive, or more than minimum, sentences are unconstitutional. Foster at paragraphs 1-6 of the syllabus. The Court severed those portions of the sentencing *Page 13 
statutes but retained the portions of the sentencing statutes that do not violate the constitution. Id. at ¶ 96. "Trial courts have full discretion to impose a prison sentence within the statutory range, and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.
 {¶ 36} While the Foster court declared that a sentencing court possesses full discretion in sentencing an offender, the court abrogated R.C. 2953.08(G), which defines the appellate court's role in sentencing, only "insofar as it applies to the severed sections" of Ohio's statutory sentencing scheme. Foster at ¶¶ 97-99. Thus, even after Foster, "[t]he appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds * * * [t]hat the sentence is otherwise contrary to law." State v.Vickroy, Hocking App. No. 06CA4, 2006-Ohio-5461, ¶ 15, citing R.C. 2953.08(G); see, also, State v. Saxon, 109 Ohio St.3d 176,2006-Ohio-1245, ¶ 4, fn. 1 (stating that "the sentencing review statute, R.C. 2953.08(G), remains effective, although no longer relevant with respect to the statutory sections severed by Foster"); State v.Rhodes, Butler App. No. CA2005-10-426, 2006-Ohio-2401.
 {¶ 37} Under this statutory standard, we neither substitute our judgment for that of the trial court nor simply defer to its discretion.State v. Mustard, Pike App. No. 04CA724, 2004-Ohio-4917, ¶ 19, citingState v. Keerps, Washington App. No. 02CA2, 2002-Ohio-4806; State v.Dunwoody (Aug. 5, 1998), Meigs App. No. 97CA11. Rather, we look to the record to determine whether the sentencing court considered and *Page 14 
properly applied the statutory guidelines and whether the sentence is otherwise contrary to law. See State v. Parrish, Montgomery App. No. 21206, 2006-Ohio-4161, ¶ 62.
 B. {¶ 38} In sentencing felony offenders, sentencing courts must consider the general guidance factors contained in R.C. 2929.11 and R.C. 2929.12.Foster at ¶ 42. The court must impose a sentence that is reasonably calculated to achieve the two overriding purposes of felony sentencing: (1) protecting the public from future crime by the offender and others; and (2) punishing the offender. R.C. 2929.11(A). It is within the court's discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in R.C. 2929.11. R.C. 2929.12(A). However, the court must consider the factors set forth in R.C. 2929.12(B) and (C) relating to the seriousness of the offender's conduct and those set forth in R.C. 2929.12(D) and (E) relating to the likelihood of the offender's recidivism. R.C. 2929.12(A). R.C. 2929.12(D)(3) specifically requires the sentencing court to consider whether "the offender has not responded favorably to sanctions previously imposed for criminal convictions."
 {¶ 39} Here, Oros maintains that the trial court's statements during the sentencing hearing show that it was punishing her for appealing a prior case that was before the same trial judge. The specific statements in question are as follows:
 THE COURT: I guess I'm in a position of being a one judge county in common pleas. All felonies come through here, so our paths, I believe initially crossed, Miss Oros, back in 2000 or thereabouts when you were convicted in this court on one count of trafficking in crack cocaine, that was a felony of the fourth degree. And I remember that and you remember that. * * * [Y]ou pled guilty and were convicted of that, and this *Page 15 
court placed you on community control at that time or what we used to call probation. And the court made certain conditions of your probation or your community control. And the record reflects that in that case there was an appeal taken before the court of appeals after you pled guilty, because you didn't agree with some of the terms and conditions I placed on you.
 * * *.
 I ordered you to stay out of that bar [the Matchbox Tavern] because that thing is nothing but a rat's nest, it's nothing but a trouble spot in this community, and anybody that's got any sense at all knows that * * *.
 After you took it up to the court of appeals and tried to get me reversed, you said I shouldn't have made that a condition of your probation. Here's the decision. * * * The last paragraph, "the trial court," that's me, "condition of staying out of the Matchbox however is reasonably related to rehabilitating Oros. The crime Oros committed and future criminality by Oros." They said I had that right, and that's why I ordered you to stay out of there. So you lost on appeal. Yeah. I hope you did stay out of there. My goal at that time was to rehabilitate you, get you out of that hell hole. And what do you do? You get off probation you go right back down there and you're running it again and dealing dope out of there again with your cousins, the Johnsons.
 THE DEFENDANT: They were, sir. Not me.
 THE COURT: Miss Oros, you can say that all you want. I sat and listened to the evidence with twelve good people from Pickaway County and they found you guilty. So if you keep telling yourself that, you're in denial. I just say that because I don't want to sound like, you know, I'm going to hammer you because this is the first time you come in front of me, you have a clean record, and you never done anything wrong in your life, and I'm not saying its being portrayed that way, because it's not, but I'm just saying I tried to turn you around, I tried. I don't think you did. I think you took this all as a joke. So now you're back in here looking at big time, and if you think it was a joke, you're going to have a lot of time to think about it for now. Because when I give someone the opportunity to turn their life around and knock it off, I expect them to do it, and when you don't then I'm going to remove you from society and I'm not going to have to worry about you dealing dope in this community, because I'm not going to put up with it. I tried to make that clear to you back in 2000, but for some reason it just did not sink in. *Page 16 
 {¶ 40} Oros asserts that "it appears that the Court determined that because [she] exercised her constitutional right to an appeal, she was not taking her probation or rehabilitative efforts seriously." We are not persuaded.
 {¶ 41} The court referenced Oros' prior appeal to illustrate the court's reasoning for requiring her to stay away from the Matchbox Tavern as a condition of her previous community control sanction, i.e., to rehabilitate her and to keep her away from the activities the court perceived to be taking place at the bar. By returning to the bar after Oros was released from her community control sanctions and by committing the same offense that resulted in the community control sanctions in the first place, Oros demonstrated that she did not respond favorably to the community control sanctions and that she did not take the court's prior warnings seriously. As such, the court felt that she was likely to re-offend in the future. We cannot say this conclusion is an error, especially considering the presence of the trial court in the prior case. Therefore, we find that the court imposed the sentences in an effort to protect the public from future offenses and to adequately punish her for the offenses, but not for appealing a prior decision of the court. Consequently, we cannot clearly and convincingly find that the court's sentences are otherwise contrary to law.
 {¶ 42} Accordingly, we overrule Oros' fourth assignment of error and affirm the judgment of the trial court.
 JUDGMENT AFFIRMED. *Page 17 
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED, and Appellant pay the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Pickaway County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J.: Concurs in Judgment Opinion to Assignments of Error I, II III;
Concurs in Judgment Only to Assignment of Error IV.
 McFarland, J.: Concurs in Judgment and Opinion. *Page 18 
 APPENDIX ONE
In affidavits submitted in support of multiple search warrants, Sergeant Chapman described the controlled buys made by a confidential informant from Oros. One such controlled buy took place on March 15, 2006, wherein officers followed Oros as she left her home at Ruth Avenue:
 At approx. 1605 hr . . the informant made a phone call to April Oros and requested an "8 Ball" of crack cocaine. April told the informant that she would deliver the product to them. While the initial contacts were being made other Task Force Officers set up surveillance around 409 Ruth Ave., here in the city [of Circleville], which is known to be April Oros' residence. At approx. 1621 hr . . the "Ruth Avenue Surveillance Officers" reported that April was leaving her house driving a white Buick bearing Ohio license plates BP63EA. The surveying officers followed April directly to the meeting point with the informant. She met with the informant at approx. 1627 hr . . Approximately one minute later she drove away after completing the sale to the informant for crack cocaine.
Sergeant Chapman also described a controlled buy of crack cocaine from Oros by a confidential informant on May 3, 2006:
 On May 3, 2006 at approx. 1830 hr. I was contacted by Task Force Agents. The agents reported that they had completed another controlled buy with an informant and that the suspect was again April D. Oros. Information was reported that the officers met with an informant here in Circleville. The informant was searched and after finding no contraband on them the informant was given recorded money along with an audio transmitter.
 The informant made a phone call to April Oros and requested an "8 Ball" of crack cocaine. Arrangements were made for the informant to meet April at the Matchbox Tavern located at 706 S. Washington St. The informant met April inside the bar. April went to the upstairs apartment above the bar, (702 ½ S. Washington St) by way of an inside *Page 19 
access door located on the southeast side of the business' interior. April returned shortly and gave the informant the product, and took $180.00 in exchange.
 The informant turned over a plastic baggy that held off white rocks to the Task Force Officers once the detail was completed. The informant was searched and no additional contraband was found. The off white rock was field tested and the results were "positive" for cocaine.
Early on May 4, 2006, Sergeant Chapman presented the multiple search warrants to a municipal judge . . The search warrants were for: (1) the Matchbox Tavern; (2) the apartment located on the second floor of the Matchbox Tavern; (3) Oros's residence on Ruth Avenue; (4) a 2001 Lexus registered to Oros; (5) a 1999 Buick registered to Oros's father, Daniel Oros. Sergeant Chapman later prepared an additional search warrant for the Ruth Avenue property after discovering a shed on the back of the Ruth Avenue property. Chapman's affidavit made in support of the search at the Ruth Avenue property stated:
 The Affiant, Sgt. Robert W. Chapman, is a Police Officer for the City of Circleville and works in the capacity of supervising the daily operations of the departments Detective Bureau. Along with these responsibilities are investigations, some of which have been and are currently on the local drug trafficking trade. On occasion, the drug investigations are in conjunction with the assistance and operations of the US Route 23 Drug Pipeline Task Force based out of the Ross County Sheriffs Department in Chillicothe, Ohio. The information obtained leading to the request for this particular warrant was received through the investigative efforts and undercover buys done by the members of the earlier mention Ross County based Task Force.
 On January 19th, 2006, the Circleville Police Department and Police Officers from the US 23 Pipeline Task Force started a drug investigation involving one April D. Oros. This investigation was conducted by the mentioned officers with the assistance of confidential sources. This investigation resulted in several controlled drug buys from April D. Oros.
 Since January 19th, this Department maintained an open, Confidential Investigation, involving the activities of April Oros. These activities included the controlled buys *Page 20 
described in the Arrest Probable cause, along with contact by Task Force Agents with confidential sources. Through the course of these contacts the following information was gathered about April Oros and her residence of 409 Ruth Ave.
 The sources reported the April Oros was known to sell drugs anywhere within the City of Circleville, which was established through the controlled buys that was conducted with her being the target. The sources reported that April use her home to conceal the drugs, mainly crack cocaine until she can distribute them. The sources indicated that hust after this investigation started, they were at Aprils' residence, and the sources saw large amounts of crack cocaine in baggy's and firearms. The sources believed the guns had been traded for drugs.
 The sources reported the April was known to deal or to have large quantities of crack cocaine on her. The sources indicated that April would make trips to Columbus Ohio to bring her product back to Circleville, where she would either deliver to buyers, or wait to be contacted at her place of employment, being the Matchbox Tavern, on S. Washington St.
 The sources indicated that April was known to use her 2001 Lexus bearing Oh tag DOM 2748 along with her father's 1999 Buick bearing Oh tag BP63EA. Both of these vehicles have been used by April during the controlled buys, and both vehicles have been documented as being at April's residence as of May 2nd, 2006.
 During the course of one of the controlled buys, Task Force Officers followed April directly from her home to a meeting spot where she sold an informant approx. 3 grams of crack cocaine.
 Most recently, sources have reported that April keeps a bulk amount of crack cocaine in a in-floor safe in her residence on Ruth Avenue, located in her bedroom. The sources stated that April keeps approx. 300 "rocks" on hand on her person at all times, all of which are located in the purple felt "Crown Royal" bag that she carries with her. The sources indicated that April's silver vehicle only leaves her residence *Page 21 
on Wednesday's when April goes to Chillicothe to pick up more bulk amounts of Crack. It was reported that April leaves her residence at approximately 1530 hours in her silver car, and travels to an unknown location in Chillicothe via US RTE 23 to her supplier. April returns to the city via US RTE 23 at approximately 1900 hours the same date. She picks up "a couple bricks" each time. *Page 1